# IN THE SUPREME COURT OF TEXAS

═══════════

NO. 08-0833

═══════════

ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC. AND
ANGLO-DUTCH (TENGE) L.L.C., PETITIONERS,

v.

GREENBERG PEDEN, P.C. AND GERARD J. SWONKE, RESPONDENTS

═══════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

═══════════════════════════════

**Argued September 14, 2010**

JUSTICE HECHT delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE JOHNSON, JUSTICE WILLETT, and JUSTICE GUZMAN joined.

JUSTICE WAINWRIGHT filed an opinion concurring in part and dissenting in part.

JUSTICE LEHRMANN filed a dissenting opinion, in which JUSTICE MEDINA and JUSTICE GREEN joined.

The parties dispute whether an attorney fee agreement is ambiguous. The client contends that an agreement on law firm letterhead, signed by a lawyer on behalf of the firm, is with the firm, not with the lawyer personally. The lawyer counters that his use of personal pronouns in the agreement, as well as surrounding circumstances, create an ambiguity that must be resolved by a jury. We agree with the client and therefore reverse the judgment of the court of appeals.[1]

---

[1] 267 S.W.3d 454 (Tex. App.–Houston [14th Dist.] 2008).

# I

Scott V. Van Dyke, president of Anglo-Dutch Petroleum International, Inc., asked Gerard J. Swonke, a lawyer "of counsel" with the firm of Greenberg Peden, P.C., to represent Anglo-Dutch as plaintiff[2] in a suit against Halliburton Energy Services, Inc. and Ramco Oil & Gas, Ltd. for disclosing confidential information concerning the development of oil and gas prospects in the Tenge Field in Kazakhstan. Greenberg Peden had represented Anglo-Dutch on various matters for years and had drafted the confidentiality agreement that would be central to the suit. Swonke had been responsible for Anglo-Dutch's initial engagement as a firm client and had done much of its work. He and Van Dyke were friends.

The Tenge Field case was expected to be protracted and difficult, and Anglo-Dutch could not afford to pay Greenberg Peden's hourly rates, as it had done in the past, so it proposed a 20% contingent fee. The firm declined. Anglo-Dutch had fallen behind in its obligations to the firm, and the firm had decided not to accept further business from Anglo-Dutch until it became current. Plus Greenberg Peden believed that it lacked the resources needed to prosecute the case on a contingent-fee basis. Swonke referred Van Dyke to another firm, McConn & Williams, which took the case.

But Swonke's continued counsel, based on his involvement in the events leading up to the litigation, was still needed, and Van Dyke asked him to assist McConn & Williams, again for a contingent fee. Swonke's arrangement with Greenberg Peden required him to offer new business to the firm; if the firm refused, Swonke could undertake the representation individually. Swonke

---

[2] An affiliate, Anglo-Dutch (Tenge) L.L.C., was also a plaintiff and is a petitioner here, wholly aligned with Anglo-Dutch Petroleum International, Inc.

used personal stationery — "Law Offices of Gerard J. Swonke Attorney at Law" — and signed individually when representing clients who were not also clients of the firm. Even in those situations, the firm sent the bills and retained ten percent of the fees. Swonke agreed to Van Dyke's proposal and dictated the following agreement ("the Fee Agreement"), which his secretary prepared on firm letterhead and he signed on its behalf:

# GREENBERG PEDEN P.C.

ATTORNEYS AND COUNSELORS AT LAW

TELEPHONE: (713) 627-2720
FACSIMILE: (713) 627-7057
WEBSITE: www.gpsolaw.com

TENTH FLOOR, 12 GREENWAY PLAZA
HOUSTON, TEXAS 77046

October 16, 2000

Mr. Scott V. Van Dyke
Anglo-Dutch Petroleum International, Inc.
Eight Greenway Plaza, Suite 900
Houston, Texas 77046

> Re: Cause No. 2000-22588; *Anglo-Dutch (Tenge) et al. vs. Ramco, et al.;* In the 151st Judicial District of Harris County, Texas.

Dear Scott:

This letter memorializes our agreement with respect to me assisting you and/or the companies which you control (Anglo-Dutch) and the law firm of McConn & Williams, LLP regarding the above-referenced matter.

In that regard, you have executed a Fee Agreement with the law firm of McConn & Williams on March 25, 2000, which is incorporated herein by reference. I agree to assist Anglo-Dutch and that firm with this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur. Further, the proportions under which my fees shall be calculated

3

will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to the nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit. In addition, should the Fee Agreement be amended, you agree that I shall be entitled to the benefit of such amendment.

If this comports with your understanding of our agreement, please indicate by signing below and returning this letter to me.

If you have any questions, please contact me.

> Very truly yours,
>
> GREENBERG PEDEN P.C.
>
> s/ *G. J. Swonke*
> GERARD J. SWONKE

AGREED TO:

_____
SCOTT V. VAN DYKE, PRESIDENT OF
ANGLO-DUTCH PETROLEUM INTERNATIONAL, INC.
DATED: _____

The next day, Van Dyke signed the agreement and returned it to Swonke. He also wrote Swonke the following letter:

## ANGLO-DUTCH PETROLEUM INTERNATIONAL

EIGHT GREENWAY PLAZA, SUITE 900                    TEL: (713) 993-9303
HOUSTON, TEXAS 77046                               FAX: (713) 993-9011
UNITED STATES                                      email@anglo-dutch.com

October 17, 2000

Mr. Gerard J. Swonke
Greenberg Peden P.C.
Tenth Floor
12 Greenway Plaza
Houston, TX 77046

Re:     McConn & Williams, LLP Attorney's Employment Agreement

Dear Jerry:

Pursuant to our Fee Agreement dated October 16, 2000, please find enclosed a copy of the executed Attorney's Employment Agreement with McConn & Williams, LLP related to Cause No. 2000-2258; *Anglo-Dutch (Tenge) et al. Vs. Ramco, et al.;* in the 151st Judicial District of Harris County Texas.

This fee agreement with McConn & Williams, LLP provides the basis for the Agreement between Greenberg Peden P.C. and Anglo-Dutch.

Very truly yours,

 s/ *Scott Van Dyke*
Scott V. Van Dyke
        President

Of significance is Van Dyke's reference to the Fee Agreement as "the Agreement between Greenberg Peden P.C. and Anglo-Dutch." Swonke received the letter but did not read it and thus did not respond.

Swonke continued to work on the case, and as provided by the Fee Agreement, Greenberg Peden invoiced Anglo-Dutch for expenses. But a year later, Greenberg Peden dissolved, and Swonke moved to McConn & Williams, again in an "of counsel" relationship. In a letter to Van

5

Dyke, Swonke wrote that he would not take the Anglo-Dutch files with him if Van Dyke objected.[3]

Van Dyke did not. Swonke continued to work on the Tenge Field case at McConn & Williams as did other lawyers, including two who were also "of counsel".

As the litigation wore on, Anglo-Dutch and McConn & Williams decided to retain additional counsel, and they hired John M. O'Quinn & Associates. McConn & Williams reduced its 20% fee to 16-2/3%, and Anglo-Dutch agreed to pay O'Quinn 20%, for a total contingent fee of 36-2/3%. Still later, Anglo-Dutch agreed to pay the fee net of expenses. The case was tried to a plaintiffs' verdict and then settled for $51 million. Anglo-Dutch's legal fees and expenses totaled slightly over $20 million.

A few days before the settlement was funded, Swonke told Van Dyke that he expected to be paid under the Fee Agreement not only for the 277 hours he worked while at Greenberg Peden but also for 1,022 hours he worked at McConn & Williams. All the other lawyers at McConn & Williams were to be paid under the firm's agreement with Anglo-Dutch. Greenberg Peden assigned its interest in the Fee Agreement to Swonke. The assignment, which Swonke prepared and signed, recited that "Swonke executed [the Fee Agreement] on behalf of (and while affiliated with) Greenberg Peden as an Of Counsel". Van Dyke offered to pay $293,338.85 for Swonke's work on the case while at Greenberg Peden but refused to pay for the time spent by Swonke at McConn & Williams.

---

[3] Swonke wrote to Van Dyke on November 6, 2001: "For many years, I have had the pleasure of representing you and your interests through my association with Greenberg Peden, P.C. However, recently Greenberg Peden, P.C. has decided to dissolve. As a result, I will have the pleasure of continuing to represent your interests as 'Of Counsel' with the law firm of McConn & Williams, L.L.P. . . . I am planning to take your files with me to my new firm. If you do not wish for me to take your files, please contact me as soon as possible so that we can make arrangements for you to take possession of them."

Anglo-Dutch sued for a declaration that the Fee Agreement was with Greenberg Peden, not Swonke personally. It also sued Swonke for breach of fiduciary duty. Swonke counterclaimed for breach of contract, asserting that he personally was party to the agreement. Swonke also alleged that Van Dyke had defrauded him. Based on Swonke's testimony that his use of firm letterhead and the firm signature block, and his characterization of the agreement in the assignment, were mistakes, and extrinsic evidence of the parties' relationship, the trial court concluded that the agreement was ambiguous and submitted the parties' dispute to the jury. The jury found that the Fee Agreement was with Swonke, that Swonke had complied with his fiduciary duty to Anglo-Dutch, and that his damages were $1 million. The jury failed to find that Van Dyke had defrauded Swonke. The trial court rendered judgment on the verdict, and the court of appeals affirmed.[4]

We granted Anglo-Dutch's petition for review.[5]

## II

We begin by considering what standards to apply in construing lawyer-client contracts. We then apply those standards to the Fee Agreement, first to its text, and then to the circumstances surrounding its execution.

## A

"'Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.'"[6] One

---

[4] 267 S.W.3d 454.

[5] 53 Tex. Sup. Ct. J. 758 (May 28, 2010).

[6] *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (per curiam) (quoting *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)).

7

such circumstance is the existence of a lawyer–client relationship between the parties.[7]  Because a

lawyer's fiduciary duty to a client covers contract negotiations between them, such contracts are

closely scrutinized.[8]  Part of the lawyer's duty is to inform the client of all material facts.[9]  And so

that this responsibility is not a mere and meaningless formality, the lawyer must be clear.

Clarity in fee agreements is certainly important to clients.  In an amicus brief supporting

Anglo-Dutch, Professor Linda Eads explains:

> [Clients] need to know they can depend on the firm they thought they hired to represent their interests.  When there is uncertainty about a firm's or attorney's responsibility for a matter, there is a real risk that loyalty to that client will become watery.  And if disputes arise about fees or other issues, clients need to know who has ultimate authority to negotiate the issue, firm management or just the attorney working on the matter.[10]

Clarity is also important to lawyers.  Professor Eads continues:

> Law firms need to know whether they are entitled to fees in order to budget their expenses and organizational strategy; firms need to know how much, and what scope of, malpractice insurance to purchase; they need to know who their clients are in

---

[7] *See Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 560 (Tex. 2006) ("When interpreting and enforcing attorney-client fee agreements, it is 'not enough to simply say that a contract is a contract.  There are ethical considerations overlaying the contractual relationship.'" (quoting *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 868 (Tex. 2000) (Gonzales, J., concurring and dissenting))).

[8] *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 699 (Tex. 2000) ("Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized."); *Archer v. Griffith*, 390 S.W.2d 735, 739 (Tex. 1964) ("Although an attorney is not incapacitated from contracting with his client for compensation during the existence of the relation of attorney and client, and a fair and reasonable settlement of the compensation to be paid is valid and enforceable, if executed freely, voluntarily, and with full understanding by the client, the courts, because of the confidential relationship, scrutinize with jealousy all contracts between them for compensation which are made while the relation exists." (internal quotation marks omitted)); *see also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18, cmt. e (2000) ("Client-lawyer fee contracts entered into after the matter in question is under way are subject to special scrutiny . . . .").

[9] *Keck*, 20 S.W.3d at 699 (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 175 (Tex. 1997)).

[10] Brief of Amicus Curiae Linda S. Eads, Associate Professor of Law, Dedman School of Law, Southern Methodist University, in Support of Petitioner at 21.

order to analyze potential conflicts of interest; and firms need to know what matters are theirs in order to staff them appropriately and ensure their clients' interests are protected.

\* \* \*

[Individual] lawyers will want the certainty that their law firm stands behind them, that the firm's malpractice carrier will defend them if necessary, and that the fee agreements they draft will be interpreted to avoid readings that would involve violations of the rules of discipline. Further, in cases in which the existence of an ambiguity appears to favor the lawyer, allowing a lawyer initially to benefit from the ambiguity might not be a good thing, even for the lawyer. By suing a former client, the lawyer's reputation often suffers. And if the ambiguity was drafted by the lawyer, Texas courts will have to decide how to handle malpractice claims based on poor draftsmanship of the fee agreement.[11]

A number of law firms also appearing as amicus curiae endorse these views.[12]

Only reasonable clarity is required, not perfection; not every dispute over the contract's meaning must be resolved against the lawyer. But the object is that the client be informed, and thus whether the lawyer has been reasonably clear must be determined from the client's perspective. Accordingly, we agree with the *Restatement (Third) of the Law Governing Lawyers* that "[a] tribunal should construe a contract between client and lawyer as a reasonable person in the circumstances of the client would have construed it."[13]

---

[11] *Id*. at 20-21.

[12] Brief of Amici Curiae Abrams Scott & Bickley, L.L.P., Arnold & Itkin LLP, Caddell & Chapman, Cornell, Smith & Mierl, LLP, Dawson, Sodd, Ellis & Hodge LLP, Law Office of James M. McCormack, and Quilling, Selander, Cummiskey & Lownds, P.C., in Support of Petitioner at 11-12. These firms describe themselves as follows: "Some . . . are larger firms with multiple offices and dozens of attorneys practicing before the Texas bar; others are small firms with just a few attorneys. Some represent primarily defendants, some represent primarily plaintiffs, and some represent plaintiffs and defendants on a regular basis. The *amici curiae* are thus in a balanced position to address the interpretation of fee agreements between lawyers and their clients." *Id*. at 1.

[13] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18(2).

Other circumstances surrounding the execution of a contract may inform its construction, but "[t]here are limits."[14] We have said:

> An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports. Only where a contract is ambiguous may a court consider the parties' interpretation and "admit extraneous evidence to determine the true meaning of the instrument."[15]

Understanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement*, but it is the parties' expressed intent that the court must determine. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.[16]

**B**

On its face, the Fee Agreement is plainly one with Greenberg Peden, not Swonke personally. The clear indicia of the firm letterhead and signature on the firm's behalf are not contradicted by the personal pronouns in the text. Swonke's uses of "I", "me", and "my" indicate that he would himself be working on the matter, which Anglo-Dutch certainly intended, but none suggests that other attorneys and staff at Greenberg Peden would be excluded from the case any more than they had

---

[14] *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) ("If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. There are limits.").

[15] *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450-451 (Tex. 2008) (per curiam) (citation omitted) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam), and citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)).

[16] *See Gannon v. Baker*, 818 S.W.2d 754, 755-756 (Tex. 1991) (per curiam) ("The parol evidence rule applies only to contractual or jural writings evidencing the creation, modification, termination or securing of a particular right or obligation. *Brannon v. Gulf States Energy Corp.*, 562 S.W.2d 219, 222 (Tex. 1977). The rule does not apply to mere statements or recitals of past facts.").

been from other Anglo-Dutch matters. Since the fee was contingent on recovery and therefore not based on any attorney's hourly rate, it would presumably make no difference to Anglo-Dutch who besides Swonke worked on the case as long as the fee was computed on his hours. One use of "I" clearly included the firm: "I will not be responsible for any expenses". The firm, not Swonke, invoiced the clients for expenses, on firm letterhead. Moreover, the second-person pronouns show that the word "you" refers sometimes only to Van Dyke individually ("you and/or the companies which you control"), sometimes only to Anglo-Dutch ("I would be entitled to receive from you"), and sometimes to Van Dyke and his companies ("you have executed" the McConn & Williams fee agreement — Van Dyke signing for his companies). In sum, the pronouns indicate only inexact drafting; none says that despite the firm letterhead and firm signature, the agreement could only have been with Swonke personally.

Nor does the fee calculation, based solely on the hours Swonke spent individually, suggest that others at Greenberg Peden were excluded from the work. Taking Swonke's time into account provided a way of limiting the fee. If anything, the rounding-up feature of the calculation might suggest a means of providing additional compensation for others who did work on the case. Anglo-Dutch was to reimburse expenses, which were billed by Greenberg Peden, not by Swonke individually.

Even if the Fee Agreement had expressly provided that only Swonke would render the legal services required, the representation could still have been a firm matter. Anglo-Dutch was already a Greenberg Peden client and had been for years. Although Swonke had first engaged Anglo-Dutch as a client and had been responsible for most of its work, Anglo-Dutch had never been Swonke's

11

non-firm client. From Anglo-Dutch's perspective, nothing in the Fee Agreement reasonably suggested that its relationship with its lawyers was changing.

## C

The trial court having determined the Fee Agreement to be ambiguous, the parties offered extensive extrinsic evidence of their intent in the ten-day trial. Given our conclusion that the agreement was not ambiguous, this evidence is of limited relevance. It cannot be used to show the parties' motives or intentions apart from the Fee Agreement; it can only provide the context in which the agreement was reached.

Van Dyke was not an unsophisticated client; indeed, it was he, not Swonke, who proposed the terms of the Fee Agreement. But for years Anglo-Dutch had been a client of Greenberg Peden, not Swonke personally. Van Dyke knew Greenberg Peden was concerned that Anglo-Dutch was delinquent in its payments to the firm, but the Tenge Field representation was on a contingent-fee basis. He also knew that the firm had refused to be lead counsel in the case, but the firm certainly had sufficient resources for a consulting role. Nothing about the parties' relationship preceding the Fee Agreement required Van Dyke to recognize that though the agreement purported to be with Greenberg Peden, it was really with Swonke.

Events following the Fee Agreement do not cast the situation in a different light. The day he signed the Fee Agreement for Anglo-Dutch, Van Dyke wrote Swonke that the agreement was with Greenberg Peden. When the firm dissolved a year later and Swonke moved to McConn & Williams, he treated all of Anglo-Dutch's files as having belonged to Greenberg Peden. Even after

12

the Tenge Field case settled and the present controversy began to emerge, Swonke stated that he had signed the Fee Agreement on behalf of Greenberg Peden and obtained an assignment of its interest.

In sum, the circumstances in which the Fee Agreement was executed do not suggest that the parties must have intended something different from what they plainly stated. We hold that the agreement was between Anglo-Dutch and Greenberg Peden.

### III

Construing client–lawyer agreements from the perspective of a reasonable client in the circumstances imposes a responsibility of clarity on the lawyer that should preclude a determination that an agreement is ambiguous in most instances. Lawyers appreciate the importance of words and "are more able than most clients to detect and repair omissions in client-lawyer contracts."[17] A client's best interests, which its lawyer is obliged to pursue, do not include having a jury construe their agreements.

The judgment of the court of appeals is reversed, and the case is remanded to the trial court for further proceedings.

_____
Nathan L. Hecht
Justice

Opinion delivered: August 26, 2011.

---

[17] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. h.

13