**Reversed and Rendered and Opinion filed May 19, 2016.**



In the

# Fourteenth Court of Appeals

## NO. 14-14-00986-CV

**THE PENN INSURANCE AND ANNUITY COMPANY, AND THE PENN MUTUAL LIFE INSURANCE COMPANY, Appellants**

**V.**

**CHAD KURIGER, Appellee**

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2013-59559**

## O P I N I O N

This appeal concerns an engagement letter involving the law firm Drinker Biddle & Reath LLP, appellant The Penn Insurance and Annuity Company ("PIA"), and appellee Chad Kuriger. The letter stated PIA agreed that Drinker Biddle would jointly represent PIA and Kuriger as defendants in connection with a matter, which had been removed from state court to federal district court. This matter proceeded to final judgment, resulting in the dismissal of Kuriger as

improvidently joined and a take-nothing judgment in favor of PIA. After PIA refused to assume Kuriger's defense in connection with another state court matter where PIA was not named, Kuriger sued PIA and its parent company, appellant The Penn Mutual Life Insurance Company ("Penn Mutual"), for breach of contract. After a bench trial, the trial court rendered judgment in favor of Kuriger. Because PIA did not agree to represent Kuriger in the second matter under the terms of the unambiguous engagement letter, we reverse and render judgment in favor of PIA and Penn Mutual.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Kuriger started working for Penn Mutual as a Regional Manager in December 2005. At the time his employment was terminated in August 2008, Kuriger held the position of Associate Regional Director. Kuriger and Penn Mutual executed a Separation of Employment Agreement and General Release in September 2008.

In January 2011, Ronnie Buster Rogers and Nola Claudette Rogers, individually and in their capacities as trustees of the Rogers Family Irrevocable Trust, filed a lawsuit against PIA and Kuriger in state district court in Harris County. This lawsuit was styled *Ronnie Buster Rogers and Nola Claudette Rogers, Individually and as Trustees of the Rogers Family Irrevocable Life Insurance Trust v. The Penn Insurance and Annuity Co. and Chad Kuriger*, with cause number 2011-04416, in the 234th District Court of Harris County, Texas. We refer to this lawsuit as *Rogers I*. In *Rogers I*, the plaintiffs alleged that PIA and Kuriger committed fraud, fraudulent inducement, and Insurance Code violations, and made negligent misrepresentations in connection with a $21,000,000 PIA life insurance policy. The *Rogers I* plaintiffs alleged that PIA was liable for both its own and Kuriger's actions under the theories of principal-agent, vicarious liability,

2

and respondeat superior.

Kuriger initially was represented by attorney John O'Neill pro bono. PIA was represented by the law firm Drinker Biddle. Gregory Star was the primary Drinker Biddle attorney representing PIA. PIA requested that Kuriger consent to the removal of the lawsuit to federal district court. Kuriger agreed, and PIA removed *Rogers I* to the U.S. District Court for the Southern District of Texas. The lawsuit's cause number in federal district court was 4:11-cv-00673.

After *Rogers I* was removed, in March 2011, Drinker Biddle sent Kuriger a letter on law firm letterhead. This letter provided:

Chad Kuriger

[address]

**Re: Ronnie Buster Rogers and Nola Claudette Rogers, Individually and as Trustees of the Rogers Family Irrevocable Life Insurance Trust v. The Penn Insurance and Annuity, Co. and Chad Kuriger, 4:11-cv-00673 (S.D. Tex)**

Dear Mr. Kuriger:

Penn Insurance and Annuity Co. ("PIA") has agreed that Drinker Biddle & Reath LLP will jointly represent you and PIA in the above captioned matter. The purpose of this letter is to confirm the terms of our engagement.

1. <u>Scope of Representation</u>. We will represent you in connection with the claims asserted against you in the above-captioned matter. The representation will not extend to any claims that do not arise out of your role as an Assistant Regional Director for PIA.

2. <u>Charges For Our Services</u>. Charges for services by our lawyers and legal assistants will [sic] billed directly to PIA.

3. <u>Term of Engagement</u>. Our engagement will continue until completion of our work on to [sic] the substantive matter for which we were engaged. However, you may terminate this engagement at any time for any reason upon written notice, and we may terminate

3

the engagement at any time in any context permitted under the applicable Rules of Professional Conduct.

　　　If we perceive that a conflict has arisen in the course of our joint representation of you and PIA, we may withdraw from our representation of you. In the event that we withdraw from our representation of you, you agree not to object to our continued representation of PIA or raise any conflict of interest issues.

　　　Please sign below and return a signed copy to me to acknowledge your assent to the terms of this engagement letter. If you have any question, feel free to contact me at [phone number].

This letter was signed for Star by another Drinker Biddle attorney (John Bloor) with permission. Kuriger signed that he agreed and accepted.

The record reflects that "the trust" filed a motion to remand, and the federal district court denied the motion. In May 2011, the federal court signed an order dismissing Kuriger without prejudice.

In June 2011, Ronnie Buster Rogers and Nola Claudette Rogers, individually and in their capacities as trustees of the Rogers Family Irrevocable Trust, filed another lawsuit—this time against Kuriger, Charles Haden, Renascence Corporation, and Executive Compensation Concepts, Inc., in Harris County district court. This lawsuit was styled *Ronnie Buster Rogers and Nola Claudette Rogers, Individually and as Trustees of the Rogers Family Irrevocable Life Insurance Trust, and Charles Schwab & Co. v. Chad Kuriger, Charles Haden, Renascence Corporation, and Executive Compensation Concepts, Inc*[.], with cause number 2011-33520, in the 127th District Court of Harris County, Texas. We refer to this lawsuit as *Rogers II*. The plaintiffs alleged that the defendants were engaged in a partnership or joint venture and that each defendant was vicariously liable for the others' actions based on respondeat superior. In addition to the fraud, fraudulent inducement, negligent misrepresentation, and Insurance Code claims asserted in

*Rogers I* in connection with the $21,000,000 life insurance policy, the plaintiffs alleged breach of fiduciary duty. Neither PIA nor Penn Mutual was named as a defendant. PIA and Penn Mutual refused to assume Kuriger's defense in *Rogers II*.

In July 2011, the federal district court signed its final judgment in *Rogers I*, which stated that "Chad Kuriger is dismissed as improvidently joined." The final judgment also stated that "[o]n the motion of the parties," Ronnie Buster Rogers, Nola Claudette Rogers, The Woodlands Dental Group PC Savings and Investment Plan and Trust, The Rogers Family Irrevocable Life Insurance Trust, The Rogers Family 2010 Irrevocable Life Insurance Trust, Ronnie Buster Rogers as trustee of the three trusts, and Nola Claudette Rogers as trustee of the three trusts "take nothing from" PIA.

Kuriger was represented by attorney David Ayers in *Rogers II*. Kuriger ultimately entered into a settlement agreement with the *Rogers II* plaintiffs.

Kuriger filed this lawsuit for breach of contract against PIA and Penn Mutual. The trial court held a bench trial. Kuriger and Scott Raynes, an attorney with the firm that represented Kuriger in *Rogers II*, testified. Franklin Best, general counsel for PIA and for Penn Mutual, also testified. Appellants presented Star by deposition. The trial court issued a final judgment, as well as findings of fact and conclusions of law, in favor of Kuriger. The trial court awarded Kuriger damages in the amount of $30,477.19. The trial court denied PIA's and Penn Mutual's request for additional specified findings of fact and conclusions of law.

This appeal followed. Appellants assert that "the evidence presented at trial was both legally and factually insufficient to establish PIA or Penn Mutual had a contractual obligation to defend Kuriger in *Rogers I*, much less *Rogers II*." Appellants specifically raise six issues: (1) the trial court erred in finding that the

engagement letter was an enforceable contract due to lack of consideration, lack of a meeting of the minds, and because PIA and Penn Mutual were not parties to the letter; (2) the trial court erred in rewriting the engagement letter to improperly extend PIA's assumption of Kuriger's defense; (3) the trial court erred in disregarding Kuriger's release of appellants from all civil liability within his severance agreement; (4) Kuriger failed to establish that Drinker Biddle was authorized to extend Kuriger a defense beyond *Rogers I*; (5) the letter was not a contract but instead was designed to discharge Drinker Biddle's obligations under the Texas Rules of Professional Conduct; and (6) the trial court erred in concluding *Rogers I* and *Rogers II* were fundamentally the same lawsuit.

## II.    ANALYSIS

For purposes of this analysis, we will presume, without deciding, that the engagement letter represented an enforceable agreement obligating PIA to provide a defense to Kuriger pursuant to the terms of the letter. We consider appellants' related issues two and six together because we conclude they are dispositive.

### A. Standard of review and governing law

In a nonjury trial, findings of fact have the same force and dignity as a jury's verdict. *Green v. Alford*, 274 S.W.3d 5, 23 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (en banc) (citing *Dallas Cty. Constable Precinct No. 5 v. Garden City Boxing Club, Inc.*, 219 S.W.3d 613, 615–16 (Tex. App.—Dallas 2007, no pet.)). When a complete reporter's record is filed, we review the trial court's findings for legal and factual sufficiency under the same standards we apply to jury verdicts. *Id.* (citing *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam)).

We review the evidence for legal sufficiency under the *City of Keller v.*

6

*Wilson*, 169 S.W.3d 802 (Tex. 2005), standard—crediting evidence favoring the verdict if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *Green*, 274 S.W.3d at 16, 22–23 (citing *City of Keller*, 168 S.W.3d at 825–26, 827). We consider the evidence in the light most favorable to the challenged finding, and we indulge every reasonable inference that would support the finding. *City of Keller*, 168 S.W.3d at 822. In reviewing a factual sufficiency challenge, we consider and weigh all the evidence in a neutral light and may set aside the finding only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Green*, 274 S.W.3d at 23 (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)).

The standard of review for conclusions of law is whether they are correct. *Zieba v. Martin*, 928 S.W.2d 782, 786 n.3 (Tex. App.—Houston [14th Dist.] 1996, no writ). We review a trial court's conclusions of law de novo, and we will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Dickerson v. DeBarbieris*, 964 S.W.2d 680, 683 (Tex. App.—Houston [14th Dist.] 1998, no pet.).

The construction of an unambiguous written contract is a question of law. *See Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam). "Whether a contract is ambiguous is also a question of law; one that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Saba Zi Expl., L.P. v. Vaughn*, 448 S.W.3d 123, 131 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011)).

7

When interpreting a contract, our primary concern is to ascertain and give effect to the written expression of the parties' intent. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (citing *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). By this approach, we "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). "[I]t is objective, not subjective, intent that controls." *Burwell*, 189 S.W.3d at 740. We give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage. *See Gilbert Tex. Constr.*, 327 S.W.3d at 126; *Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009). We examine the writing as a whole to harmonize and give effect to all of the contract's provisions so that none is rendered meaningless or surplusage. *J.M. Davidson*, 128 S.W.3d at 229; *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) ("long-established rule" is that "[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions"); *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983). We also bear in mind the particular business activity to be served, and when possible and proper, we avoid a construction that is unreasonable, inequitable, and oppressive. *Frost Nat'l. Bank v. L & F. Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam).

If a contract is not ambiguous, courts must enforce it as written without considering parol evidence for the purpose of creating an ambiguity or giving the contract "a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam). The contract is unambiguous if it can be given a certain or definite meaning as a matter of law.

*El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012) (citing *Italian Cowboy Partners*, 341 S.W.3d at 333). A contract is not ambiguous simply because the parties advance conflicting interpretations. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). If the contract is subject to more than one reasonable interpretation after applying the pertinent rules of contract construction, then the contract is ambiguous and there is a fact issue regarding the parties' intent. *El Paso Field Servs.*, 389 S.W.3d at 806 (citing *J.M. Davidson*, 128 S.W.3d at 229).

As explained by the Supreme Court of Texas in *Anglo-Dutch Petroleum International*, in the particular context of a "lawyer-client contract," we construe the agreement as a reasonable person in the circumstances of the client would have construed it. *See* 352 S.W.3d at 451 (recognizing that "reasonable clarity" but "not perfection" is required to inform client). With this standard in mind, we first consider the text of the engagement letter, and then the circumstances surrounding its execution. *See id.* at 449.

**B. The unambiguous March 10, 2011 engagement letter**

The letter begins with an "re:" or "in the matter of" subject line. *See* New Oxford American Dictionary 1450 (3d edition 2010). This bold-face subject line consists of a particular case style, cause number, and court: "**Ronnie Buster Rogers and Nola Claudette Rogers, Individually and as Trustees of the Rogers Family Irrevocable Life Insurance Trust v. The Penn Insurance and Annuity, Co. and Chad Kuriger, 4:11-cv-00673 (S.D. Tex)**." In its opening sentence, just after the salutation, the letter states that "[PIA] has agreed that Drinker Biddle & Reath LLP will jointly represent you and PIA in the above captioned matter." "Represent" means to act or speak on behalf of another, in an official capacity, such as a lawyer on behalf of a client. *See* New Oxford American Dictionary

9

1481; Black's Law Dictionary 1494 (10th ed. 2014) ("representation"). "Jointly" means "with another person or people; together." New Oxford American Dictionary 938; *see id.* ("joint" means "shared, held or made by two or more people, parties, or organizations together"). The plain-usage definition is consistent with the legal definition of "joint representation," which dates back to 1947: "The simultaneous representation of more than one person in the same matter; esp. a lawyer's representation of two or more clients with potentially conflicting interests." Black's Law Dictionary 1494. "Caption" essentially means the introductory portion of a court paper or legal document stating the name of the parties, name of the court, the docket number, and the title or heading of the document. *See* New Oxford American Dictionary 259; Black's Law Dictionary 254. "Matter" means "something that is to be tried or proved in court; a case." New Oxford American Dictionary 1080; *see* Black's Law Dictionary 1126 ("a subject under consideration, esp. involving a dispute or litigation; case"). In other words, PIA agreed that Drinker Biddle would represent Kuriger with PIA together in the named case as reflected in the above subject line. The letter then states that its "purpose . . . is to confirm the terms of our engagement."

Next, within the "Scope of Representation" section, the letter states that "We will represent you in connection with the claims asserted against you in the above-captioned matter." "Claim" means "a demand or request for something considered one's due." New Oxford American Dictionary 318; *see* Black's Law Dictionary 301 ("a demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for"). Drinker Biddle's representation "will not extend to any claims that do not arise out of your role as an Assistant Regional Director for PIA." "Arise" means "occur as a result of," originate, or stem from. New Oxford

10

American Dictionary 85; Black's Law Dictionary 129.  In other words, Drinker Biddle would represent Kuriger in connection with the claims asserted against him by the plaintiffs in the referenced case, but only to the extent such claims stemmed from his position as an Assistant Regional Director for PIA, i.e., a course and scope of employment-type limitation.

Within the "Charges For Our Services" section, the letter states that "Charges for services by our lawyers and legal assistants will billed [sic] directly to PIA."  In other words, PIA would be responsible for paying the charges for work done by Drinker Biddle lawyers and legal assistants in connection with Kuriger's representation.

Within the "Terms of Engagement" section, the letter states that:

> Our engagement will continue until completion of our work on to [sic] the substantive matter for which we were engaged.  However, you may terminate this engagement at any time for any reason upon written notice, and we may terminate the engagement at any time in any context permitted under the applicable Rules of Professional Conduct.

> If we perceive that a conflict has arisen in the course of our joint representation of you and PIA, we may withdraw from our representation of you.  In the event that we withdraw from our representation of you, you agree not to object to our continued representation of PIA or raise any conflict of interest issues.

"Engage" means "arrange to employ or hire," and here "engagement" refers to the arrangement of a lawyer-client relationship.  *See* New Oxford American Dictionary 1574–75; Black's Law Dictionary 646.  "Substantive" means "having a firm basis in reality and therefore important, meaningful, or considerable" or "having a separate and independent existence."  New Oxford American Dictionary 1746.  "Completion" means "the action or process of finishing something."  *Id.* at 355.  In other words, the engagement would continue until Drinker Biddle finished its work

on the existing case. The letter goes on to describe possible termination of the engagement by either Kuriger or Drinker Biddle. "Terminate" means "bring to an end" or "conclude." *Id.* at 1791; Black's Law Dictionary 1700. The letter also states that Drinker Biddle may withdraw from representing Kuriger if it becomes aware of a conflict arising during Drinker Biddle's joint representation of Kuriger and PIA. "Withdraw" means cease to participate or discontinue. New Oxford American Dictionary 1985; *see* Black's Law Dictionary 1836 ("to terminate one's representation of a client before a matter is complete"). Kuriger agreed not to object to or raise issues concerning Drinker Biddle's continuing to represent PIA.

Appellants and Kuriger advance conflicting interpretations of what the engagement letter covered. Appellants' position is the parties intended for PIA to assume Kuriger's defense only in *Rogers I*. According to appellants, the trial court failed to enforce the unambiguous contract as written and created a contract where one did not exist with regard to defending Kuriger in any matter beyond *Rogers I*. Appellants contend that Kuriger's—and the trial court's—interpretation of the engagement letter "fundamentally dodges the terms of the letter, which was restricted to one identified, identifiable, pending action—*Rogers I*." Appellants further assert that the trial court disregarded key distinctions between *Rogers I* and *Rogers II* in finding that *Rogers II* was, in effect, a continuation of *Rogers I*. Appellants contend that *Rogers II* was predicated on the assertion of a conspiracy among the codefendants to create and commoditize a particular type of life insurance policy not permitted by appellants. They also emphasize that *Rogers I* was still an active lawsuit with Kuriger an active defendant when *Rogers II* was filed, and *Rogers II* did not allege any tortious conduct by appellants or that Kuriger was acting on their behalf.

Although Kuriger acknowledges *Rogers II* "is silent as to Penn Mutual and

12

PIA," his position is that the parties intended to defend Kuriger with regard to all claims arising out of his work in the course and scope of his employment with appellants. In other words, appellants' duty to defend should be based on a straight comparison of the claims asserted in the *Rogers I* and *Rogers II* petitions, and there is no dispute that the claims were generally the same.

Within its findings of fact and conclusions of law, the trial court stated:

Ultimately Kuriger was dismissed from the [*Rogers I*] case, without prejudice, based on the theory of fraudulent joinder. While the litigation was still pending against PIA/Penn Mutual, Rogers sued Kuriger again in state court based on the same facts and six of the identical legal theories as he had before. In short, Kuriger had been sued again on the same substantive legal claims that PIA/Penn Mutual had agreed to defend. It was the same transaction and occurrence. The Court finds it merely fortuitous that the lawsuit was split into more than one part, and that it is not credible for Defendants to contend that they had intended to merely represent Kuriger in that very precise captioned federal matter. For one thing, that matter started its existence with a different, state-court style and cause number. Defendants did not complain about that nor withdraw their defense based upon that. Further, Defendants' counsel had no real response when asked by the Court during trial about what would have happened in if the federal lawsuit had been severed into two causes (one with Kuriger as a defendant, and one with PIA/Penn [Mutual] as a defendant). Would their argument have been the same? The Court finds it not credible to contend that the representation could have or would have been discontinued in such a circumstance. The fact pattern in this case is not logically or meaningfully distinguishable.

The trial court further stated:

Kuriger tendered his defense to PIA/Penn Mutual through the lawyers at Drinker Biddle for the second, refiled state court lawsuit. Drinker Biddle failed and refused to continue Kuriger's defense.

Kuriger signed a letter agreement with PIA/Penn Mutual.[1] Kuriger

---

[1] This "letter agreement" refers to what we have termed the engagement letter on Drinker

performed all of his responsibilities under his agreement with PIA/Penn Mutual. PIA/Penn Mutual breached their agreement with Kuriger by abandoning his defense after Kuriger had assisted in defending the Rogers I defense group resulting in PIA/Penn [Mutual] being let out of all the litigation. As the result of PIA/Penn Mutual's breach of their agreement with Kuriger, Kuriger has suffered damages as the result of attorney's fees paid and incurred and litigation expenses paid and incurred.

Based on a plain reading of the engagement letter, however, we cannot agree with the trial court that PIA and Penn Mutual intended to defend Kuriger in *Rogers II*. The engagement letter clearly states that PIA agreed that Drinker Biddle would "jointly represent [Kuriger] and PIA in the above captioned matter." The letter does not indicate PIA agreed that Drinker Biddle would solely represent Kuriger in other, differently captioned matters. The trial court emphasized that *Rogers II* was filed while *Rogers I* was still pending against PIA and that *Rogers II* involved many of the same facts and legal claims as *Rogers I*. While admittedly there is significant overlap between the claims asserted in *Rogers I* and *Rogers II*, comparing the claims asserted in each matter fails to take into account the plain and consistent language of the engagement letter providing the requisite context to "the substantive matter for which [Drinker Biddle] was engaged." The context of the agreed engagement was the "joint" representation of Kuriger and PIA. The context was a then-pending lawsuit brought by the Rogers plaintiffs in state court against both defendants Kuriger and PIA that had been removed by consent to federal court—the "captioned" matter in the subject line.

The trial court found that *Rogers I* and *Rogers II* were "the same transaction and occurrence" and it was mere fortuity that *Rogers I* was "split into more than one part." Perhaps it was not credible for appellants "to contend that they had

Biddle letterhead dated March 10, 2011 signed by Kuriger and for Star by Bloor.

14

intended to merely represent Kuriger in that very precise captioned federal matter" given that the matter had been removed from state court. And we tend to agree with the court that appellants "did not complain about . . . nor withdraw their defense based upon" the fact "that matter started its existence with a different, state-court style and cause number."[2] But intent still must be tethered to the words as expressed within the entirety of the engagement letter so that no provision or phrase is rendered meaningless. *See J.M. Davidson*, 128 S.W.3d at 229; *Coker*, 650 S.W.2d at 393–94. *Rogers II* was not the *Rogers I* matter remanded back to state court. Instead, the federal court found improper joinder and denied the plaintiff's request for remand.[3] *Rogers I* proceeded to final judgment. Nor was *Rogers II* a "part" of *Rogers I* "severed into two causes" in federal court, "one with Kuriger as a defendant, and one with PIA/Penn [Mutual] as a defendant." Rather, *Rogers II* was a separate lawsuit involving some different parties, which began after *Rogers I* was filed and removed and before a final judgment was issued in *Rogers I*, and therefore was not tied to the existence of the "captioned" matter.

Additionally, the engagement letter states that Drinker Biddle "will represent

---

[2] Of course, there did not seem to be any need for the engagement letter to otherwise refer to the original state court cause number since the matter had since been removed with Kuriger's consent to federal court and assigned a federal cause number by the time of the letter.

[3] The removing party bears the burden of demonstrating improper joinder, and this burden is a heavy one. *See Travis v. Irby*, 326 F.3d 644, 649 (5th Cir. 2003). Improper joinder can be established in two ways: "(1) actual fraud in the pleading of jurisdictional facts, or (2) inability of the plaintiff to establish a cause of action against the non-diverse party in state court." *Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 573 (5th Cir. 2004) (en banc) (quoting *Travis*, 326 F.3d at 646–47). The second way requires the defendant to demonstrate "there is no possibility of recovery by the plaintiff against an in-state defendant, which stated differently means that there is no reasonable basis for the district court to predict that the plaintiff might be able to recover against an in-state defendant." *Id. Rogers I* proceeded to final judgment resulting in dismissal without prejudice of Kuriger and a take-nothing judgment in favor of PIA. The record does not reflect any appeal by the *Rogers I* plaintiffs of the federal court's denial of the motion to remand based on improper joinder. *See In re 1994 Exxon Chem. Fire*, 558 F.3d 378, 384 (5th Cir. 2009). According to Star, *Rogers I* terminated.

[Kuriger] in connection with the claims asserted against [him] in the above-captioned matter" not to extend beyond his role as an Assistant Regional Director. Focusing on the phrase "claims asserted," Kuriger and the trial court interpret this statement as including a promise to continue representing Kuriger if those same claims are later reasserted in another matter. However, we cannot isolate this description of the scope of representation from its setting and consider it apart from PIA's agreement that Drinker Biddle "will jointly represent [Kuriger] and PIA in the above captioned matter." *See Forbau*, 876 S.W.2d at 134. The trial court's interpretation fails to afford the "jointly represent" and "joint representation" phrases used within the engagement letter any consequence. *See Coker*, 650 S.W.2d at 394 ("Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless."). Not only was *Rogers II* a different matter in terms of its "caption," but also there was no need for "joint representation" because—regardless of the facts or claims at stake—there is no dispute that only Kuriger, with several other defendants but not including PIA or Penn Mutual, was sued by the plaintiffs. We therefore cannot agree with the trial court that the circumstances presented in *Rogers II* were not "logically or meaningfully distinguishable" from those in *Rogers I*.

To the extent that the trial court concluded that the engagement letter was ambiguous, it was incorrect. Because the plain language of the engagement letter unambiguously expresses the parties' intent that PIA agreed Drinker Biddle would jointly represent Kuriger and PIA as defendants in the "captioned" case, it was not reasonable for the trial court to conclude that the parties instead intended that PIA provide and pay for Drinker Biddle's singular representation of Kuriger in a later-filed state court case separate and differently-captioned from the original state

16

court case removed to federal court. Considering the engagement letter "from the perspective of a reasonable client in the circumstances" does not affect our conclusion because such reasonable client would not read the letter's plain language as expressing the intent urged by Kuriger and accepted by the trial court. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 451, 453.

## C. Extrinsic evidence

We next consider the circumstances surrounding the engagement letter's execution because "[u]derstanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement." *See id.* at 451. However, because we have concluded that the engagement letter is unambiguous, parol evidence of intent is "of limited relevance." *See id.* at 452 ("Given our conclusion that the agreement was not ambiguous, this evidence is of limited relevance. It cannot be used to show the parties' motives or intentions apart from the Fee Agreement; it can only provide the context in which the agreement was reached.").[4] We conclude that the circumstances in which the engagement letter was executed do not indicate the parties intended anything different from what was plainly stated. *See id.* at 453.

The record shows that some months after the *Rogers I* plaintiffs sued both PIA and Kuriger in state court, after PIA removed the case to federal court with

[4] We note that the parties have taken conflicting, at times inconsistent, positions with regard to the role of parol evidence. At trial, Kuriger insisted that the letter agreement was unambiguous and objected to appellants' admission of parol evidence in an attempt to change or alter any of the agreement's terms. Appellants argued that parol evidence of the surrounding circumstances would inform the text of the contract. The trial court overruled Kuriger's objections. On appeal, however, it is appellants that stress the letter agreement must be interpreted by its own unambiguous terms. Kuriger, in contrast, states that "there is no contractual bar to the consideration of extrinsic evidence such as the phone conversation between Kuriger and Star preceding the letter." Where all the parties offered extrinsic evidence relating to the engagement letter in this bench trial, we will apply the standard provided in *Anglo-Dutch Petroleum International*.

Kuriger's consent, and while Kuriger was still represented by O'Neill, Star and Bloor called Kuriger. According to Kuriger, PIA's attorneys reached out to him "out of nowhere" because they needed help defending the case. Kuriger testified that they "[s]aid that they would defend me too. So we—you know, got together." There was no negotiation or other explanation or discussion regarding the terms of the letter agreement. Star testified that his intention, as clearly laid out in the engagement letter, was to undertake "a joint representation of both PIA and Mr. Kuriger" "in connection with 'the above captioned matter.'" According to Star, Kuriger's then-attorney O'Neill reviewed and approved the letter. Kuriger "never asked any questions." Best testified that PIA made the decision to have Drinker Biddle represent PIA and Kuriger in *Rogers I* because appellants "have a practice of sharing counsel with a codefendant who is an employee or former employee." Best stated that he was involved in the issuance of the engagement letter and "the intent was to and the authorization was to represent [Kuriger] only in that lawsuit that was captioned in the letter." Nothing about the parties' interactions preceding and up to the engagement letter indicated that PIA intended anything other than what was plainly expressed in the letter—Drinker Biddle would defend "together" PIA and Kuriger jointly as "codefendants" in the as-captioned *Rogers I*. *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 452–53.

Nor do events following the engagement letter cast the situation in a different light. *See id.* at 453. After the federal court issued its order dismissing Kuriger from *Rogers I* without prejudice, Kuriger had "congratulatory phone calls with Star and Bloor that it was all over." After Kuriger was served with the petition in *Rogers II*, he called Star and informed him, "Hey, I got named again," and asked him, "Okay, what do we do?" Email correspondence reflects Kuriger requested that appellants "assume" his defense in *Rogers II* and that Star call

18

attorney David Ayers to coordinate. Star responded that there was no current insurance coverage for Kuriger under any PIA program and advised him that PIA was "not assuming [his] defense" in *Rogers II*. Ayers responded back that Kuriger had asked Ayers "to assist him in this matter" and requested that Star "confirm that PIA is fully aware that [Kuriger's] defense will include course and scope and that it has nevertheless decided to let [Kuriger] go it alone." At that time, Kuriger and Ayers did not raise any obligation of PIA to represent Kuriger in *Rogers II* based on the engagement letter. According to Best, the reasoning behind appellants' decision to not defend Kuriger in *Rogers II* was that neither PIA nor Penn Mutual was named as a defendant.

Overall, the circumstances in which the engagement letter was executed "do not suggest that the parties must have intended something different from what they plainly stated." *See Anglo-Dutch Petroleum Int'l*, 352 S.W.3d at 453.

Based on the plain language of the unambiguous engagement letter and consistent with the extrinsic evidence, we conclude as a matter of law that the terms of the parties' agreement do not extend to the legal defense of Kuriger in *Rogers II*. As a result, there was no breach of the engagement letter by PIA or Penn Mutual based on the abandonment of Kuriger's defense. Nor can we affirm the judgment based on any other legal theory. We sustain appellants' second and sixth issues.[5]

---

[5] Because sustaining appellants' second and sixth issues results in reversal and rendition, we need not reach appellants' other issues. *See* Tex. R. App. P. 47.1.

### III. CONCLUSION

Accordingly, we reverse the trial court's judgment and instead render judgment that Kuriger take nothing from PIA and Penn Mutual on his breach-of-contract claims.


/s/ Marc W. Brown
   Justice


Panel consists of Justices Boyce, Busby, and Brown.

20