# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-15-00429-CV

**Dennis Draper, Greg Hadley, and Charles Huston, Appellants**

**v.**

**Austin Manufacturing Services I, Inc., Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT
### NO. D-1-GN-09-004416, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from the demise of a start-up company and requires us to determine whether the evidence is legally sufficient to support the district court's findings that the appellants are liable for breach of guaranty agreements that they signed. The guaranty agreements specifically refer to a purchase order 1682 ("P.O. 1682") and state that the underlying obligation is to be that of an entity named Assistant, Pro, Inc as the purchaser. However, P.O. 1682 itself identifies a different entity as the purchaser, and the evidence also reflects that the unpaid balances at issue relate to purchase orders bearing identification numbers different than P.O. 1682, or to raw materials, work-in-progress, or finished goods not tied to a particular purchase order. Upon reviewing the evidence in light of the precise terms of the guaranty agreements, we conclude that the evidence is legally insufficient to support the district court's findings that appellants breached their guaranties. We will therefore reverse and render judgment that appellee take nothing on its claims against appellants.

## BACKGROUND

The summary that follows is derived from the evidence presented at trial. Appellee Austin Manufacturing Services I, Inc. (AMS)[1] manufactures electronic assemblies for clients. One of AMS's clients was TQI Systems, Ltd. (TQI), a company that builds oilfield products. In 2007, TQI's owner and President, Daryl Cornish, approached AMS's CEO, Brad Scoggins, to request AMS's services in manufacturing a new product. Cornish and appellants—Dennis Draper, Greg Hadley, and Charles Huston—had formed a new entity, Assistant-Pro, Inc. (A-Pro),[2] to develop the "Golf Guru," a hand-held GPS device for use on the golf course. Cornish proposed that AMS open a new account to manufacture the Golf Guru for A-Pro.

**P.O. 1682 and the personal guaranties**

Cornish contemplated that AMS would manufacture an initial 5,000 Golf Guru units to be delivered within four months.[3] The new A-Pro account required an approximate $650,000 line of credit, and AMS was unwilling to proceed unless (i) both TQI and A-Pro were jointly responsible on the account (given that only TQI had a credit history with AMS), and (ii) Cornish and appellants

---

[1] Although some of the underlying events involved a predecessor entity, there is no dispute that AMS has succeeded to any interests relevant to the litigation.

[2] Cornish and appellants were each a shareholder and director of A-Pro, and appellant Huston served as A-Pro's President. Cornish was the sole owner of TQI and served as its President.

[3] E-mails sent by Cornish in September 2007 "suggest [that] we order 5k for delivery in November immediately" and also state that "[w]e need a firm PO from [A-Pro] for 5k units . . . with takedown of all production within 4 months of delivery of first units." AMS provided TQI with a "Quotation," dated September 24, for the sale of 5,000 Golf Guru units at a unit price of $128.95 each. Both Richard Horne, TQI's Vice President of Operations at the time, and Huston, testified that a quick delivery of the Golf Guru was important because the selling season for golf equipment was the Christmas season (and Huston further testified that the season extended through about May).

each signed a personal guaranty for 25 percent of the debt.  According to a September 24, 2007, e-mail from Cornish to Huston:

> AMS normally takes our PO's out of Quickbooks.
>
> Right now we are operating off of TQI's credit w/ AMS.  TQI has done over a million with AMS over the last two years, we have an exemplary credit history (lots of revenue because of the oilfield stuff), and we have always paid on time (even though we don't always get paid on time ;-). . . .
>
> We have broached this issue with Brad Scoggins a couple of times, and his feeling was that because [A-Pro] has little or no credit history (he checked), the partners would probably have to sign guarantees with AMS to get a $650k line, and at the very least it would take a month. . . .
>
> As long as I have pro-rata guarantees from the partners and an agreement with teeth, [A-Pro] can make out the PO to TQI for the first 5k, and TQI will issue the PO to AMS.  We can setup books for [A-Pro] in Quickbooks and issue the first PO in under TQI and [A-Pro's] names so that [A-Pro] starts to build credit history.[4]  After we sell the first 5k, I assume it will be much easier to get credit directly for [A-Pro]. . . .
>
> Note that it will take 6 weeks from the time we get the PO until first article.

At the request of Cornish, Huston prepared a draft purchase order ("P.O. # [100]") for the purchase of 5,000 Golf Guru units with a "4 month take down."  The draft was an A-Pro form (and listed A-Pro at the top), was "authorized" by Huston for A-Pro, and listed TQI (via Cornish) as the recipient to whom the products would be shipped.

---

[4] Huston testified that Cornish had suggested in July and August of 2007 that "the purchase orders come through TQI, and that the shareholders all guarantee the purchase order.  We discussed that, and Hadley, Draper, and Huston adamantly refused to do that.  We said, [w]e have no interest in TQI. We have an [interest] in [A-Pro]."

Huston's draft purchase order was not used.[5]  Instead, AMS accepted a purchase order from TQI dated October 9, 2007—P.O. 1682—for the purchase of 5,000 Golf Guru units with a purchase price of $128.95 per unit and expected delivery on November 23, 2007.  P.O. 1682 identified TQI as the purchaser[6] and stated that the Golf Guru units were to be shipped directly to TQI.[7]

Huston testified that Richard Horne, TQI's Vice President of Operations at the time, proposed using AMS's form guaranty, which was "open-ended" and said "all amounts owed."  In response, Huston on October 19, 2007, sent an e-mail to Horne, Cornish, and appellants that enclosed a revision limiting the amount guaranteed to "all amounts due to [AMS], under Purchase Order _____ *for the purchase of 5000 Golf Guru units (hereinafter 'Guaranteed Portion').*"[8]

---

[5]  Horne testified that "a PO was originally sent from [A-Pro] to AMS that was rejected [by AMS] because of the credit payment."

[6]  The P.O. was not signed, but the parties do not dispute that it is enforceable at least against TQI.

[7]  Horne testified that A-Pro and TQI were separate companies and that neither appellants nor any A-Pro employees had offices at TQI.  Cornish testified that A-Pro and TQI did not share the same tax identification number.  A-Pro and TQI executed a management contract that tasked TQI with developing the Golf Guru, building a website, and providing sales and marketing for the product.  AMS delivered the Golf Guru units to TQI, which sold them out of the TQI office for the benefit of A-Pro.  TQI and A-Pro had separate telephone numbers that were both answered from TQI's office.  Horne testified that incoming phone calls would sometimes be answered as "A-Pro" and other times would be answered as "TQI."  Scoggins testified that, based on prior conversations with Cornish, he understood TQI and A-Pro to be "one and the same company" by virtue of having "the same physical location," "the same personnel," "commingled addresses," and commingled payments.

[8]  (Emphasis added.)  Huston's revision consisted of the italicized portion of the foregoing quote.

Huston's proposed language was incorporated into the guaranties, which were signed by the four

A-Pro principals[9] on October 22, 2007:

**[AMS Logo]**
**Personal Guaranty**

I [signatory] (hereinafter referred to as the "Guarantor") . . . *for and in consideration of your extending credit at my request to Assistant, Pro, Inc., a Texas corporation (hereinafter referred to as the "Purchaser"),* of which I am a shareholder, personally guarantee to you the payment of twenty five percent (25%) [of] all amounts due to Austin Manufacturing Services LP. Inc., . . . under Purchase Order 1682 for the purchase of 5000 Golf Guru units (hereinafter "Guaranteed Portion").

I hereby agree to pay such Guaranteed Portion punctually *if default in payment thereof is made by the Purchaser.* The Guarantor will pay such Guaranteed Portion without requiring Austin Manufacturing Services L.P[.], or any of assignee[s] hereof, to proceed first to enforce payment upon the *Purchaser. . . .* Without in any way limiting the generality of the foregoing, the Guarantor acknowledges that this guaranty encompasses *Purchaser's purchases of goods and/or services on account for said Guaranteed Portion*, interest incurred thereon, plus any collection expense incurred while trying to collect the Guaranteed Portion while in default, including but not limited to, attorney fees, and court costs.[10]

In sum, the personal guaranties were made "in consideration of [AMS] extending credit" to A-Pro

(the "Purchaser") under P.O. 1682, and were premised on "a default in payment . . . by the

Purchaser," but P.O. 1682 itself identified TQI as the purchaser. On October 22, Huston sent an

e-mail to Horne (copying the A-Pro principals) that highlighted this discrepancy and requested to

revise the purchaser indicated on P.O. 1682 from TQI to A-Pro.[11] Horne on November 6 forwarded

---

[9] Cornish and appellants each signed a separate guaranty agreement, and each agreement contained terms that were identical to the other agreements.

[10] (Emphases added.)

[11] Huston's October 22 e-mail stated: "The PO is from [A-Pro] to AMS, right? [A-Pro] needs to be building its credit history with AMS." At trial, Huston testified that "we had made it perfectly

the e-mail to Scoggins, who replied and asked for "a new PO."[12]  Scoggins testified that he never

received the new purchase order.

**The subsequent purchase orders**

AMS did not deliver 5,000 Golf Guru units by the November 2007 delivery date set

forth in P.O. 1682.[13]  In January 2008, Cornish and Horne were contemplating switching to color

units in lieu of the black-and-white units already ordered.[14]  Soon thereafter, TQI tendered to AMS

a second P.O. 1682, again dated October 9, 2007 (the date of the original P.O. 1682), for the

purchase of 1,000 Golf Guru units.[15]  In 2008 and 2009, AMS received several additional purchase

orders from TQI or A-Pro for both grayscale and color Golf Guru units.  Each of these orders contain

_____

clear that the guarantors would only guarantee a purchase order from [A-Pro].  Never from TQI."

[12]  Horne's November 6 e-mail to Scoggins stated that "[w]e need to switch the PO for the 5000 pieces from [TQI] . . . to [A-Pro], per Chad Huston's request.  All the personal guarantees are from the principals of [A-Pro]."  Scoggins replied to Horne,"Can you send over a new PO?"

[13]  Cornish testified that units began shipping in late 2007 but that initial sales were hindered by problems with many of the golf-course maps on the Golf Guru.  In contrast, Hadley testified that the units were "selling like crazy" and that he believed that "[i]f all 5,000 had been delivered as indicated by the purchase order, . . . we would have sold them."

[14]  Cornish testified that the market dictated that A-Pro needed to sell a color unit and that A-Pro's shareholders decided as a group to make this change.  Horne and possibly Cornish discussed the change with AMS, but appellants dispute that they were ever notified of, or consented to, the change.  According to Cornish, "we took the parts from the grayscale unit and tried to build a color unit around those parts.  And what we ended up doing was, the only parts that changed were the case, and then we had to make a little adapter board for the display, and then we had to make—or we needed a color display, obviously."

[15]  The second P.O. 1682 reflected a purchase price of $133.08 per unit but retained November 23, 2007, as the expected delivery date.

a "P.O. Number" other than P.O. 1682, and most of the orders dated December 2008 or later identify A-Pro (rather than TQI) as the purchaser.[16]

AMS representatives and Cornish testified that P.O. 1682 was, in their view, a "blanket" or "master" purchase order that identified the entire number of Golf Guru units for purchase (i.e., 5,000 units), to be followed by subsequent "takedown" or "release" orders of product to be delivered and credited against the "blanket" order. Horne also testified that the original P.O. 1682 (for 5,000 units) allowed for subsequent changes to the order.[17] According to Cornish, the P.O. numbers for the subsequent orders were randomly generated by TQI's "Quickbooks" software, which it used to generate purchase orders.

Appellants dispute that P.O. 1682 was a "blanket" purchase order and urge that the order contained no terms identifying it as such. Draper testified that he had never heard of a "blanket" purchase order prior to the trial, and Huston similarly testified that he did not know the meaning of a "take-down" order. Appellants also point to Horne's testimony that he understood the

---

[16] Cornish testified that the subsequent orders were supposed to be issued in A-Pro's name (to build its credit history) but that some of the early orders were inadvertently issued in the name of TQI.

[17] Both versions of P.O. 1682 reference a September 24, 2007, Quotation from AMS regarding the price that it would charge TQI to manufacture 5,000 grayscale units. The Quotation states that "[a]ny [Bill of Materials] or other changes creating obsolete stock not usable on another PCA will be charged to the Customer at the landed cost of these obsolete parts." Horne understood these terms allowed for changes to the order, with the customer made responsible for the charges associated with such changes. He further testified that he "would expect the guarantor's liability" under P.O. 1682 to be limited to the amount described therein (i.e., 5,000 units at $128.95) notwithstanding any subsequent changes to the order.

7

second P.O. 1682 (for 1,000 units), and the other subsequent Golf Guru purchase orders, as different than the original P.O. 1682.[18]

In total, AMS delivered approximately 5,300 Golf Guru units,[19] and all of the units delivered were sold. However, Cornish testified that sales were lackluster (which he attributed to continuing problems with the course maps), and TQI and A-Pro were unable to fully repay AMS.[20]

As of 2009, AMS had unpaid Golf Guru receivables totaling $241,977.52. Of these receivables, AMS's records reflect no balance due under P.O. 1682 (and that a balance previously due under P.O. 1682—for 1,000 units at a purchase price of $133.08 per unit—had been paid in full). In other words, the unpaid accounts receivable in AMS's records relate to the other purchase orders that contain different identification numbers and that are at the core of the parties' dispute as to whether P.O. 1682 was a "blanket" purchase order. Moreover, the Golf Guru raw materials, work in progress, and finished goods described in AMS's records are not linked to a particular purchase order number.

---

[18] Horne testified that the subsequent purchase orders should be credited against P.O. 1682 if the e-mail delivering the orders said as much. He had no personal knowledge of what the delivery e-mails said.

[19] AMS received several payments for the units delivered, though the sum total of the payments was less than the total balance due. Some of the payments were made by TQI, and others were made by A-Pro. There were also two payments for which AMS could not identify the payor.

[20] Cornish in 2008 recruited an additional A-Pro investor, Tim Albers, to help save the company. Appellants consented to Albers's investment, but they claim it virtually "washed out" their equity interest in A-Pro. Appellants contend that they had no control over A-Pro following the Albers investment, and they criticize Cornish for allegedly allocating sales proceeds towards A-Pro's operating expenses that they claim should instead have been used to repay AMS.

8

**The litigation**

AMS sued A-Pro, TQI, Cornish, and appellants.[21] Against A-Pro and TQI, AMS asserted claims for breach of contract, suit on a sworn account, and quantum meruit.[22] Against Cornish and appellants, AMS asserted a claim for breach of the guaranty agreements. The defendants, including appellants, denied AMS's allegations.[23]

The case was tried to the bench. At trial, Cornish did not dispute that A-Pro owed the amounts that AMS claimed it was owed under P.O. 1682, and he further admitted his personal liability as a guarantor for 25 percent of these amounts.[24] Appellants, however, disputed that they similarly owed any such obligation as guarantors.

The district court subsequently rendered judgment for AMS (i) on its contract claim against A-Pro and TQI, and (ii) on its breach-of-guaranty claim against Cornish and appellants. The district court also made findings of fact and conclusions of law. The court found that "A-Pro/TQI's

---

[21] AMS also asserted claims against two additional entities that Cornish had formed with appellants to own the Golf Guru patent and license it to A-Pro, Optimal I.P. Holdings, L.P. and Optimal Intellectual Property, Inc. These entities were ultimately non-suited before trial.

[22] AMS alleged damages of $241,977.52 under P.O. 1682 and also sought attorney's fees. In support of its suit on a sworn account, AMS attached records "reflect[ing] [A-Pro's] account" that showed $241,977.52 in unpaid aging receivables. The receivables related to purchase orders bearing identification numbers different than P.O. 1682.

[23] After trial but before the rendition of judgment, appellants filed a second supplemental answer asserting that AMS's claims against them were barred because the transaction that was guaranteed (a purchase order for 5,000 Golf-Guru units by A-Pro) never occurred, or alternatively, "the guaranteed transaction was materially altered by the parties and replaced by a new contract (which ha[d] been fully paid), and the guarantors . . . were discharged as a matter of law."

[24] Cornish further testified that appellants were aware that P.O. 1682 named only TQI as the purchaser and did not raise this issue until AMS made a demand under the guaranties.

outstanding balance due to AMS, . . . for purchases under PO 1682 . . . is comprised of: (1) accounts receivable of $241,977.52; (2) work in progress of $51,873.06; (3) raw materials in the amount of $42,379.58; and (4) finished goods in the amount of $6,254.76," for a total of $342,484.92.[25] The court found that Cornish owed 25 percent of this amount (i.e., $85,621.23) based on his approval and consent to "personally guarantee the purchase of both color and black and white Golf Guru units from AMS by A-Pro under PO 1682." The court also found that appellants guaranteed 25 percent of the purchase of 5,000 black-and-white units at a unit price of $128.95, the outstanding balance of which was $281,633.89,[26] which amounted to $70,408.47 owed by each appellant. In total, the judgment awarded AMS: (i) $382,484.92 against A-Pro and TQI, jointly and severally; (ii) $85,621.23 against Cornish; and (iii) $70,408.47 against each of appellants.[27]

Draper, Hadley, and Huston appealed the judgment.[28]

---

[25] The court also found that "[t]he total amount past due and owing to AMS by A-Pro and TQI, . . . for all purchases made by A-Pro/TQI was $382,484.92."

[26] The district court found that appellants had not guaranteed any color units.

[27] The April 2015 judgment awarded AMS additional sums for pre- and post-judgment interest, attorney's fees, and court costs. After the district court's plenary power had expired, AMS filed a motion for judgment nunc pro tunc on the basis that the judgment misstated AMS's name and incorrectly stated the amount of attorney's fees awarded. The district court rendered another judgment on July 6, 2015, to correct these clerical errors. The July 6 judgment states that it "does not modify in any substantive way the Court's prior judgment and merely corrects these two clerical errors."

[28] TQI, A-Pro, and Cornish have not appealed.

**ANALYSIS**

Appellants raise four issues, three of which challenge the legal sufficiency of the evidence to support the district court's findings. In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact serve the same function as a jury's verdict.[29] Appellants challenge the legal sufficiency of the evidence supporting the district court's liability findings adverse to them.[30] They will prevail in their challenge if the record shows any one of the following: (1) there is no evidence supporting a vital fact, (2) the evidence offered to prove a vital fact is no more than a mere scintilla, (3) the evidence conclusively establishes the opposite of the vital fact, or (4) the court is barred by law or the rules of evidence from considering the only evidence offered

---

[29] *See Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Davis v. Johnston*, No. 03-10-00712-CV, 2012 Tex. App. LEXIS 5249, at *36 (Tex. App.—Austin June 28, 2012, no pet.) (mem. op.). In addition, we review a trial court's legal conclusions de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Nadeau Painting Specialist, Ltd. v. Dalcor Prop. Mgmt., Inc.*, No. 03-06-00060-CV, 2008 Tex. App. LEXIS 5356, at *17 (Tex. App.—Austin July 18, 2008, no pet.) (mem. op.). "The court's conclusions will be upheld unless they are erroneous as a matter of law." *Nadeau Painting Specialist, Ltd.*, 2008 Tex. App. LEXIS 5356, at *17 (citing *Florey v. Estate of McConnell*, 212 S.W.3d 439, 445 (Tex. App.—Austin 2006, pet. denied)). "Incorrect conclusions will not require reversal if controlling findings of fact will support a correct legal theory." *Id.* (citing *Florey*, 212 S.W.3d at 445).

[30] More precisely, appellants "contend that (1) AMS presented no evidence on a point on which it bore the burden of proof, the absence of which was fatal to its claim, and/or (2) the evidence in the record conclusively establishes the opposite of a fact essential to AMS's prima facie case." Appellants' first and third issues challenge adverse liability findings on which AMS had the burden of proof, whereas their second issue challenges adverse findings vital to the affirmative defense of material alteration, on which they bore the burden of proof. *See Barnes v. Old Am. Mut. Fire Ins. Co.*, No. 03-07-00404-CV, 2010 Tex. App. LEXIS 1353, at *13–14 (Tex. App.—Austin Feb. 26, 2010, no pet.) (mem. op.) ("Because a material alteration is an affirmative defense, the burden is on the guarantor to prove that a material alteration occurred."). We need not reach the merits of appellants' second issue given our conclusion that their first and third issues are determinative of this appeal.

11

to prove the vital fact.[31]  "More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.'"[32]  "'When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence . . . in legal effect, is no evidence.'"[33]  Conversely, evidence conclusively establishes a vital fact when the evidence is such that reasonable people could not disagree in their conclusions.[34]

**Whether P.O. 1682 with TQI as purchaser is within the scope of the guaranties**

Appellants contend in their first issue that the evidence conclusively establishes that "the transaction contemplated by the [guaranties]" (i.e., a P.O. 1682 from A-Pro) "did not occur, such that there was no transaction to guarantee."  In other words, appellants argue that their guaranties do not cover the transaction that did occur, a P.O. 1682 from TQI.  In the context of the elements of a breach of guaranty claim, we understand appellants as claiming that (i) the condition on which their liability is based did not occur (i.e., there was no P.O. 1682 from A-Pro), and (ii) appellants therefore did not fail or refuse to perform their promise since their promise was

---

[31] *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Davis*, 2012 Tex. App. LEXIS 5249, at *36–37.

[32] *Merrell Dow Pharms. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)); *Davis*, 2012 Tex. App. LEXIS 5249, at *37.

[33] *Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) (quoting *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 & n.3 (Tex. 1993)).

[34] *See City of Keller*, 168 S.W.3d at 814–17; *Davis*, 2012 Tex. App. LEXIS 5249, at *37.

contingent on a default by A-Pro.[35] The district court found that (i) A-Pro was a party to P.O. 1682,[36] (ii) A-Pro defaulted on its obligations under P.O. 1682,[37] and (iii) appellants therefore defaulted on their obligations "under P.O. 1682 and the [g]uaranties."[38] Appellants' first issue challenges the legal sufficiency of the evidence to support these findings.

---

[35] *See, e.g.*, *Stone v. Midland Multifamily Equity REIT*, 334 S.W.3d 371, 378 (Tex. App.—Dallas 2011, no pet.) (reciting elements of a breach-of-guaranty claim: "(1) the existence and ownership of the Guaranty; (2) the performance of the terms of the contract by [the plaintiff]; (3) *the occurrence of the condition on which liability is based*, and (4) *[the guarantor's] failure or refusal to perform the promise*" (emphasis added)).

[36] *See, e.g.*, Findings of Fact at ¶ 4 ("A-Pro/TQI contracted with AMS . . . . Defendants A-Pro/TQI entered into a contract with AMS on behalf of A-Pro to purchase 5,000 black and white Golf Guru units priced at $128.95 each on October 9, 2007. . . . A-Pro/TQI assumed responsibility for any and all materials [and/or] all units manufactured by AMS pursuant to or under PO 1682. As such, A-Pro/TQI are jointly responsible for and obliged to AMS under PO 1682."). The district court also concluded that "Purchase Order 1682 (PO 1682) is an enforceable, valid contract between AMS, TQI and A-Pro. . . . PO 1682 may be enforced by AMS against TQI and A-Pro." Conclusions of Law at ¶ 5.

[37] *See* Findings of Fact at ¶ 24 ("A-Pro/TQI defaulted on their obligations to AMS, including specifically on their obligations under PO 1682; . . . A-Pro/TQI have failed to pay for the G[o]lf Guru units ordered and delivered under PO 1682."); *id.* at ¶ 26 ("A-Pro/TQI . . . failed to pay their due-and-owing obligations to AMS . . . ."). The district court further concluded that "A-Pro/TQI" failed to pay "in full for all the Golf Guru units manufactured and delivered by AMS," and that this failure constituted a "material breach" of "A-Pro/TQI's" obligations. Conclusions of Law at ¶¶ 7–8.

[38] *See* Findings of Fact at ¶ 25 ("The Guarantors defaulted on their obligations to AMS under PO 1682 and the Guarantees; the Guarantors have not paid AMS the amounts they guaranteed and that A-Pro/TQI failed to pay to AMS under PO 1682. Each Guarantor has breached his Guaranty to AMS."); *id.* at ¶ 26 ("[T]he Guarantors each failed to pay their due-and-owing obligations to AMS despite multiple demands made by AMS . . . ."). The district court also concluded that "[t]he Guarantors failed to perform their material obligations to AMS by failing to remit . . . payment in the amount of the Guaranteed Portion . . . under PO 1682. This failure to perform constituted a material breach of the Guarantors' obligations to AMS under their respective Guarantees." Conclusions of Law at ¶ 9; *see id.* at ¶ 12 ("The Guarantees obligated [appellants] to each pay 25% of the purchase price of 5,000 black and white Golf Guru units at $128.95 per unit, but [appellants] have failed to make these required payments to AMS.").

We begin by examining the guaranty agreements to ascertain the terms to which appellants agreed.**[39]** We construe a guaranty agreement as any other contract,**[40]** subject to the caveat that an ambiguous guaranty agreement should be given a construction that favors the guarantor.**[41]** Our "'primary concern . . . is to ascertain the true intentions of the parties as expressed in the

---

**[39]** *See U.S. Foodservice, Inc. v. Winfield Project Mgmt., LLC*, No. 03-14-00405-CV, 2016 Tex. App. LEXIS 4075, at *19 (Tex. App.—Austin Apr. 20, 2016, no pet.) (mem. op.) ("Our analysis begins by examining the text of the Personal Guaranty to ascertain the terms to which [the guarantor] agreed." (citing *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014); *McKnight v. Virginia Mirror Co.*, 463 S.W.2d 428, 430 (Tex. 1971); *Barnes*, 2010 Tex. App. LEXIS 1353, at *8)).

**[40]** *See Moayedi*, 438 S.W.3d at 7 ("Courts construe unambiguous guaranty agreements as any other contract." (citing *Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex. 1983))); *Toor v. PNC Bank, Nat'l Ass'n*, No. 05-11-00012-CV, 2012 Tex. App. LEXIS 7158, at *6 (Tex. App.—Dallas Aug. 24, 2012, no pet.) (mem. op.) ("Courts construe guaranty agreements as any other contract." (citing *Mid-South Telecomms. Co. v. Best*, 184 S.W.3d 386, 390 (Tex. App.—Austin 2006, no pet.))); *Barnes*, 2010 Tex. App. LEXIS 1353, at *8 (recognizing that meaning of unambiguous guarantee agreement is determined through ordinary contract-construction principles).

**[41]** *See Moayedi*, 438 S.W.3d at 7 ("If the meaning of a guaranty agreement is uncertain, 'its terms should be given a construction which is most favorable to the guarantor.'" (quoting *Coker*, 650 S.W.2d at 394 n.1)); *Pham v. Mongiello*, 58 S.W.3d 284, 288 (Tex. App.—Austin 2001, pet. denied) ("If a guaranty is ambiguous and susceptible to two reasonable interpretations, courts should use the interpretation that favors the guarantor.").

14

instrument.'"[42]  As recently explained by the Texas Supreme Court with respect to the construction of contracts:

> We have noted for decades that the construction of an unambiguous contract, including the determination of whether it is unambiguous, depends on the language of the contract itself, construed in light of the surrounding circumstances. *See Anglo-Dutch Petroleum [Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011)] ("Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.") (internal quotation marks omitted) (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (per curiam)); *Tawes [v. Barnes*, 340 S.W.3d 419, 426 (Tex. 2011)] (determining third-party-beneficiary status by considering "the oil and gas industry's customary purpose for using [joint operating agreements], and . . . the plain language of the [agreement] at issue here"); *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 144 Tex. 475, 191 S.W.2d 716, 724 (Tex. [1945]) (holding that oil-and-gas contract "must be construed in connection with the rules and the customs of the industry to which the contract relates").
>
> These types of references to the "circumstances" surrounding a contract recognize that evidence of the circumstances may assist courts in construing the language the parties used, but they do not authorize courts to rely on such evidence to add to or alter the terms contained within the agreement itself. When parties "have a valid, integrated written agreement," the parol-evidence rule "precludes enforcement of prior or contemporaneous agreements." *Hous[ton] Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). As a result, "extrinsic evidence cannot alter the meaning of an unambiguous contract." *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 170 (Tex. 2009).

---

[42] *Moayedi*, 438 S.W.3d at 7 (quoting *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003)). In doing so we must "'examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless.'" *Id.* (quoting *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006)). "[U]nless the agreement shows the parties used a term in a technical or different sense," we give terms "their plain, ordinary, and generally accepted meaning." *Id.* (citing *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996)). We must construe an unambiguous contract as a matter of law, and whether a contract is ambiguous "is itself a question of law." *First Bank v. Brumitt*, ___ S.W.3d ___, No. 15-0844, 2017 Tex. LEXIS 447, at *15–16 (Tex. May 12, 2017) (citations omitted).

Courts may consider the "context in which an agreement is made" when determining whether the contract is ambiguous, but the parties may not rely on extrinsic evidence "to create an ambiguity or to give the contract a meaning different from that which its language imports." *Anglo-Dutch Petroleum*, 352 S.W.3d at 451 (internal quotation marks omitted) (quoting *David J. Sacks*, 266 S.W.3d [at] 447, 450–51). *But see Lewis v. E*[*ast*] *Tex. Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (Tex. 1941) (holding that courts may not consider "proof of circumstances" evidence "when the instrument involved, by its terms, plainly and clearly discloses the intention of the parties, or is so worded that it is not fairly susceptible of more than one legal meaning or construction") (citing *Anderson & Kerr Drilling Co. v. Bruhlmeyer*, 134 Tex. 574, 136 S.W.2d 800, 805 (Tex. 1940)).

If a court concludes that the parties' contract is unambiguous, it may still consider the surrounding "facts and circumstances," but "simply [as] an aid in the construction of the contract's language." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). In other words, the parol-evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Hous*[*ton*] *Expl.*, 352 S.W.3d at 469. Courts may consider such contextual evidence "in determining the parties' intent as expressed in the agreement, but the court must determine the parties' expressed intent. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated." *Anglo-Dutch Petroleum*, 352 S.W.3d at 451.[43]

---

[43] *Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *24–26; *see id.* at *26–27 ("In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous language, *see Tex*[*as*] *State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017), circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say."); *Houston Expl.*, 352 S.W.3d at 469 ("A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule. . . . The rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text. Those circumstances include, according to Professor Williston's treatise, 'the commercial or other setting in which the contract was negotiated and other *objectively determinable factors* that give a context to the transaction between the parties.'" (citing *Sun Oil Co.*, 626 S.W.2d at 731, and quoting 11 Richard A. Lord, *Williston on Contracts* § 32.7 (4th ed. 1999) (emphasis added))).

The guaranties at issue were made "*for and in consideration of [AMS] extending credit at [the guarantor's] request to [A-Pro], . . . (hereinafter referred to as the 'Purchaser'), of which [the guarantor is] a shareholder.*"[44] Each guarantor personally guaranteed his "Guaranteed Portion" due "under Purchase Order 1682 for the purchase of [5,000] Golf Guru units," and this obligation was to be triggered by a "default in payment . . . *made by the Purchaser*" (i.e., A-Pro).[45] By their unambiguous terms, the guaranties require a P.O. 1682 in which *A-Pro* (not TQI) serves as the purchaser. The guaranties must be "strictly construed" in the sense that they "may not be extended by construction or implication beyond the[ir] precise terms."[46]

We next examine P.O. 1682, to which the guaranties refer.[47] As described previously, there are two versions of P.O. 1682, both dated October 9, 2007. While each version of the P.O.

---

[44] (Emphasis added.)

[45] (Emphasis added.)

[46] *McKnight*, 463 S.W.2d at 430 ("After the terms of a guaranty agreement have been ascertained, the rule of strictissimi juris applies, meaning that the guarantor is entitled to have his agreement strictly construed and that it may not be extended by construction or implication beyond the precise terms of his contract.")*; see Vastine v. Bank of Dall.*, 808 S.W.2d 463, 464 (Tex. 1991) (per curiam) ("Guarantors and sureties are bound only by the precise terms of the contract they have secured and are not obligated to watch over the contracting parties to see that performance conforms to the terms of the contract."); *U.S. Foodservice, Inc.*, 2016 Tex. App. LEXIS 4075, at *15–16 ("Texas courts have long held that guarantee or surety agreements must be 'strictly construed' in the sense of not being extended beyond their precise unambiguous terms.").

[47] *See, e.g.*, *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) ("[A]greements executed at the same time, with the same purpose, and as part of the same transaction, are construed together." (citing *Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984))); *Maan v. First ATM, Inc.*, 2008 Tex. App. LEXIS 9279, at *32 (Tex. App.—Austin Dec. 12, 2008, no pet.) (mem. op.) ("An unsigned paper may be incorporated by reference in the contract signed by the party sought to be charged. . . . The specific language used is not important so long as the contract signed by the party plainly refers to another writing." (citing *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968))).

identifies a different quantity and a different price per unit,[48] both versions list TQI as the sole customer.[49] Neither version of P.O. 1682 fits the criteria upon which liability is conditioned in the guaranties—a P.O. with A-Pro as the purchaser. AMS contends that it "would not have extended credit to A-Pro" absent enforceable guaranties and that it "manufactured and delivered the Golf Guru units to A-Pro, pursuant to PO 1682, fulfilling the business deal made contingent on the . . . Guarantees." Regardless of whether the parties had subjective intent to include A-Pro as a party to P.O. 1682, we are bound by the unambiguous terms of the P.O. itself, which identifies only TQI as the purchaser.[50] Moreover, Huston's preliminary draft purchase order, which listed A-Pro and TQI but was ultimately not used, cannot alter the unambiguous terms of the final P.O. accepted by AMS.[51] Nor can the district court's findings that A-Pro and TQI are "sister"[52] or "affiliated"[53]

---

[48] The first version of P.O. 1682 identifies 5,000 units to be sold at a price of $128.95 per unit, whereas the second version identifies 1,000 units to be sold at a price of $133.08 per unit.

[49] Both versions also contain a box labeled "Quote #," and this box refers to "9/24/2007." We interpret this reference as incorporating the September 24 Quotation from AMS for the sale of 5,000 Golf Guru units. *See Maan*, 2008 Tex. App. LEXIS 9279, at *32; *supra* at 2, 7 (background discussion regarding September 24 Quotation). The Quotation refers to TQI as the "[c]lient."

[50] *See, e.g.*, *Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *26 ("Courts may consider . . . contextual evidence 'in determining the parties' intent *as expressed in the agreement*, but the court must determine the parties' expressed intent. Extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated.'" (quoting *Anglo-Dutch Petroleum*, 352 S.W.3d at 451)); *id.* at *26–27 ("[C]ircumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say."); *Sun Oil Co.*, 626 S.W.2d at 731 ("'In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls.'" (quoting *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968))).

[51] In *Houston Exploration*, the Texas Supreme Court reaffirmed its holdings from two prior cases that "deletions in a printed form agreement are indicative of the parties' intent" and "must be

18

companies render A-Pro a party to the P.O., given the lack of any findings (and the absence of any

supporting evidence) that would be required to disregard their separate existence, such as that A-Pro

used TQI to perpetrate a fraud on AMS.[54]

---

considered in construing the other provisions." 352 S.W.3d at 469–72. The court stated that "'[n]egotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract interpreted as a whole.'" *Id.* at 469–70 (quoting *Tanner Dev. Co. v. Ferguson*, 561 S.W.2d 777, 781 (Tex. 1977), and citing Restatement (Second) of Contracts § 214 (1981) ("negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (c) the meaning of the writing, whether or not integrated")). However, the court expressly declined to decide whether "deletions in drafts indicate the parties' intent in the final agreement." *Id.* at 472; *see id.* ("[T]he law has long recognized that *changes in a printed form must be accorded special weight* in construing the instrument." (emphasis added)). We do not interpret *Houston Exploration* as extending beyond its facts, given the general prohibition in Texas against using extrinsic evidence to vary the terms of an unambiguous contract or to create an ambiguity. *See, e.g.*, *Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *25–26; Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006) ("Evidence of prior policies is extrinsic evidence, and thus inadmissible unless this policy is ambiguous. . . . And while we have looked at a prior policy in deciding between reasonable constructions of a current one, we have never done so in lieu of construing the current one at all.").

[52] *See* Findings of Fact at ¶ 2 ("A-Pro and TQI (hereinafter 'A-Pro/TQI') are sister companies doing business in Travis County, Texas.")

[53] *Id.* at ¶ 3 ("A-Pro and TQI shared common management[,] including specifically but not limited to . . . Cornish and employee Richard Home ('Home'), office space and other resources, were affiliated companies in all respects, and interacted with . . . AMS . . . as a single and/or joint unit.").

[54] *Cf. SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 456 (Tex. 2008) ("[W]e hold that the single business enterprise liability theory . . . will not support the imposition of one corporation's obligations on another."); *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 374–75 (Tex. 1984) ("Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances. . . . [T]he plaintiff in a contract case has had prior dealings with the parent corporation. Absent some deception or fraud, the risk of loss is apportioned by virtue of relative bargaining power."); *Shook v. Walden*, 368 S.W.3d 604, 611–14 (Tex. App.—Austin 2012, pet. denied) (explaining historical development of veil-piercing principles under Texas law); Tex. Bus. Orgs. Code § 21.223(a)(2) (barring shareholder liability to corporation or its obligees with respect to "any contractual obligation of the corporation . . . on the basis that the [shareholder] . . .

At bottom, the guaranties and P.O. 1682 are unambiguous, and we must construe them as a matter of law.[55] We cannot extend the guaranties beyond their precise terms,[56] which are contingent on A-Pro serving as the purchaser under P.O. 1682. But the P.O. itself reflects that TQI, not A-Pro, was the purchaser, and we cannot use extrinsic evidence to alter its terms.[57] Accordingly, we conclude that the evidence is legally insufficient to support the district court's findings that A-Pro was a party to P.O. 1682, or that appellants defaulted on the guaranties. In addition, there are no other findings of fact to support the district court's conclusion that appellants are in default.[58] We therefore sustain appellants' first issue.

**Whether unpaid balances not linked to P.O. 1682 were within the guaranties' scope**

In addition to our holding that the guaranties were contingent upon A-Pro serving as the purchaser in the underlying transaction, we alternatively consider appellants' third issue, which

---

is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory"); Tex. Bus. Orgs. Code § 21.223(b) (providing that "Subsection (a)(2) does not prevent or limit the liability of a [shareholder] . . . if the obligee demonstrates that the [shareholder] . . . caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the [shareholder]").

[55] *See Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *15–16, 24.

[56] *See Vastine*, 808 S.W.2d at 464; *McKnight*, 463 S.W.2d at 430; *U.S. Foodservice, Inc.*, 2016 Tex. App. LEXIS 4075, at *15–16.

[57] *See Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *25–27; *Sun Oil*, 626 S.W.2d at 731.

[58] *See Nadeau Painting Specialist, Ltd.*, 2008 Tex. App. LEXIS 5356, at *17 (explaining that "[t]he court's conclusions will be upheld unless they are erroneous as a matter of law" and that "[i]ncorrect conclusions will not require reversal if controlling findings of fact will support a correct legal theory").

claims that "any amounts due [to AMS] arose from other purchase orders not subject to the Guarant[ies], such that, as a matter of law, [appellants] cannot be held liable under the Guarant[ies]." The district court found that "A-Pro/TQI took and accepted delivery of several thousand Golf Guru units manufactured pursuant to PO 1682,"[59] thereby implicitly finding that the subsequent orders bearing different identification numbers (which relate to about 4,300 units of the approximate 5,300 units delivered) were part of P.O. 1682.[60] The court also found that "[t]he Guarantees obligated [appellants] to each pay 25% of the purchase price of 5,000 black and white Golf Guru units at $128.95 per unit,"[61] thus finding that the guaranties covered 5,000 units notwithstanding that most of these units were delivered pursuant to subsequent purchase orders that had identification numbers other than P.O. 1682.

We begin by reviewing the evidence in light of the guaranties' terms. The guaranties are limited to "all amounts due . . . *under Purchase Order 1682* for the purchase of 5000 Golf Guru units."[62] While AMS delivered approximately 5,300 units, its records reflect that the balance previously owed under "P.O. 1682" was paid in full,[63] and the balances that remained relate to

---

[59] *See* Findings of Fact at ¶ 9.

[60] The court also found that "A-Pro/TQI's outstanding balance due to AMS . . . for purchases under PO 1682" totaled $342,484.92. *See id.* at ¶ 12. This amount includes unpaid receivables of $241,977.52, *see id.*, which match the receivables sought by AMS related to the purchase orders bearing different identification numbers. This amount also included work-in-progress of $51,873.06, raw materials of $42,379.58, and finished goods of $6,254.76. *See* Findings of Fact at ¶ 12.

[61] *See id.* at ¶ 12.

[62] (Emphasis added.)

[63] For example, AMS offered an exhibit that summarized the amounts paid and balances due for each Golf Guru purchase order, broken down by black-and-white and color units. The exhibit

purchase orders that bear different identification numbers, or to raw materials, work-in-progress, and finished goods that were not linked to a particular purchase order.[64] We cannot extend the guaranties to cover these items since the guaranties by their precise terms are limited to P.O. 1682.[65]

AMS attempts to avoid this result through evidence that the parties understood P.O. 1682 to be a blanket purchase order. However, trial testimony that blanket purchase orders (and accompanying release orders) are customary in the manufacturing industry and that P.O. 1682 was such an order cannot be used to alter or add to the unambiguous terms of the P.O., which do not refer to any "blanket" or "release" orders and instead refer to a single delivery date—November 23, 2007.[66] Similarly, references to a four-month "takedown" in preliminary e-mail communications

shows that AMS received payment of $133,133.01 for 1,000 Golf Guru units delivered pursuant to P.O. 1682 (which coincides approximately with the second version of the P.O., which ordered 1,000 units at a price of $133.08 per unit), leaving a "Balance Due" of "–" for P.O. 1682. AMS also offered a summary exhibit that listed by P.O. and sales order number amounts invoiced, amounts paid, and balances due. The exhibit reflects thirteen invoices related to P.O. 1682, and a balance due of "–" for each such invoice.

[64] For example, AMS offered exhibits that showed accounts receivable due under Golf Guru purchase orders bearing different identification numbers—e.g., P.O. 1007, P.O. 1019, P.O. 1855, P.O. 09-174-TB-2, and P.O. 09353SB4. AMS also offered a compilation of invoices related to Golf Guru orders, and Scoggins admitted that the invoices that reference P.O. 1682 do not appear in AMS's report of aging receivables. Another AMS exhibit summarized all amounts allegedly due and owing, including accounts receivable, raw materials, work-in-progress, and finished goods (and which totaled $342,484.92). The items described in this exhibit are not linked to a particular purchase order number.

[65] *See Vastine*, 808 S.W.2d at 464; *McKnight*, 463 S.W.2d at 430; *U.S. Foodservice, Inc.*, 2016 Tex. App. LEXIS 4075, at *15–16.

[66] *See, e.g., Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *26–27; *Sun Oil*, 626 S.W.2d at 731. Both versions of P.O. 1682 contain the November 23 delivery date. Also, as noted previously, both versions of P.O. 1682 incorporate a prior September 24 Quotation from AMS. AMS points to a clause in the Quotation stating that "changes creating obsolete stock not usable . . . will be charged to the Customer." While this clause reflects that the parties anticipated potential

between Cornish and Huston, and in the preliminary draft purchase order that was circulated by Huston but was ultimately not used, cannot be construed to alter the final P.O.[67]

AMS also points to the parties' "subsequent course of business" as evidence that they must have intended P.O. 1682 to include the subsequent purchase orders. While AMS delivered approximately 5,300 Golf Guru units under the purchase orders (which slightly exceeds the 5,000 units described in the guaranty agreements and in the original P.O. 1682), its records reflect that the unpaid amounts for these deliveries relate to the subsequent orders other than P.O. 1682. In sum, we find no evidence to support the district court's findings of amounts owed under P.O. 1682. In the absence of such evidence, the guaranty agreements do not apply under their precise and unambiguous terms,[68] and there are no other findings of fact to support the district court's conclusion that appellants defaulted on their guaranties.[69] We therefore sustain appellants' third issue.[70]

---

changes, it reveals nothing about whether future orders bearing different identification numbers were to be considered as part of P.O. 1682. On the other hand, appellants point to a clause in the Quotation stating that "[a] reference on the PO to this liability is necessary to process the order, *unless a Manufacturers Service Agreement (MSA) is in place*." (Emphasis added.) The fact that P.O. 1682 referenced the Quotation implies that an MSA was not in place (in other words, had an MSA been in place, a reference to the Quotation would have been unnecessary).

[67] *See Brumitt*, ___ S.W.3d at ___, 2017 Tex. LEXIS 447, at *25–26; *Fiess*, 202 S.W.3d at 747.

[68] *See Vastine*, 808 S.W.2d at 464; *McKnight*, 463 S.W.2d at 430; *U.S. Foodservice, Inc.*, 2016 Tex. App. LEXIS 4075, at *15–16.

[69] *See Nadeau Painting Specialist, Ltd.*, 2008 Tex. App. LEXIS 5356, at *17.

[70] We need not consider appellants' fourth issue, which complains of the award of attorney's fees to AMS.

## CONCLUSION

We reverse the judgment of the district court and render judgment that AMS take nothing on its claims against appellants.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Field

Reversed and Rendered

Filed:   July 13, 2017