# Supreme Court of Texas

No. 21-0509

Finley Resources, Inc., Finley Production Co., L.P. and Petro Canyon Energy, LLC,

*Petitioners,*

v.

Headington Royalty, Inc. and Headington Energy Partners, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued November 30, 2022**

Justice Devine delivered the opinion of the Court, in which Chief Justice Hecht, Justice Lehrmann, Justice Blacklock, Justice Busby, Justice Bland, Justice Huddle, and Justice Young joined.

Justice Boyd filed a concurring opinion.

This appeal involves a dispute over the interpretation of a release provision in an agreement exchanging mineral interests. The trial court held that contract language releasing claims against a named entity's "predecessors" barred the releasor's recovery against an unaffiliated and unrelated "predecessor in title." The court of appeals reversed and

rendered judgment that, as used in the release agreement, the term "predecessors" refers only to corporate predecessors. Construing the term in context, we agree with the court of appeals and affirm its judgment.

## I

The underlying breach-of-contract and negligence suit arises from the alleged termination of a 1966 oil-and-gas lease (the Arrington Lease) covering interests in a tract of land in Loving County, Texas (the Loving County Tract). Over the years, various assignments and conveyances resulted in horizontal severance of the mineral rights. Headington Royalty, Inc. and Headington Energy Partners, LLC (collectively, Headington) ultimately acquired the deep rights while Finley Resources, Inc. and Finley Production Co., L.P. (collectively, Finley) ultimately acquired the shallow rights. At some point, Finley Resources also became the operator of record for two wells producing oil from the shallow zone (the Arrington Wells).

Headington alleges it lost its mineral rights under the Arrington Lease due to nonproduction from the Arrington Wells. According to Headington, the Arrington Lease terminated as to both the deep and shallow rights no later than March 31, 2017, because the wells stopped producing in paying quantities and neither party engaged in other lease-perpetuating operations. Headington claims that Finley's persistent failure to provide Headington with contractually required notices and well data left Headington in the dark about both the impending and actual termination of the mineral lease.

Petro Canyon Energy, LLC entered the picture in June 2017 when it acquired a top lease from W.I.R.C., LLC for the entirety of the

2

Loving County Tract (the WIRC Lease). The top lease would become valid only when the Arrington Lease expired.[1] So to determine if that event had occurred, counsel for Petro Canyon's affiliate, Double Eagle Development, sent a letter to Finley requesting well revenue and expense information for the preceding eighteen-month period.

The following month, Headington began its own inquiry into the Arrington Lease's status. Headington's legal counsel sent a letter to Finley, requesting production of "complete and current data and information" about Finley's operations. The letter was not so subtle in intimating that Headington was prepared to take legal action if Finley failed to comply. The next day, Finley Resources, as operator of the Arrington Wells, dispatched a responsive letter to Headington Energy's land department, declaring Finley's intent to plug and abandon the wells and offering Headington an opportunity to step into its shoes as well operator. Headington concedes that, by this point, it was already contemplating litigation, and on August 2, its attorneys issued a written demand that Finley produce any information showing the Arrington Lease had not already terminated.

The issue now on appeal arises in connection with a series of unusual transactions that followed Headington's August 2 demand letter.

First, in August 2017, Finley and Petro Canyon collaborated to resolve any doubt about the Arrington Lease's continuing subsistence.

---

[1] A top lease is "[a] lease granted on property already subject to an oil-and-gas lease. Generally, any rights granted by a top lease . . . are valid only if the existing lease ends." BLACK'S LAW DICTIONARY (11th ed. 2019).

To that end, Finley assigned its Arrington Lease interests, if any, to Petro Canyon via a Quitclaim Assignment and executed an affidavit confirming the absence of production and any other well operations since January 1, 2017. In return, Petro Canyon agreed to (1) "assume and perform, any and all of [Finley's] liabilities and obligations, or alleged or threatened liabilities and obligations" under the Arrington Lease and (2) indemnify Finley "against any and all claims, losses, damages . . . or judgments . . . [for] any and all [alleged or threatened] liabilities and obligations . . . arising out of . . . ownership or operation of the [Arrington Lease]." Although the Quitclaim Assignment bore an August 31 effective date, it was not filed in the public record until October 31.

In the meantime, Headington was separately negotiating with Petro Canyon to acquire the WIRC Lease for the asserted purpose of mitigating losses ensuing from termination of its deep-rights interests under the Arrington Lease. Acquisition of the WIRC Lease would allow Headington to expand its interests in the Loving County Tract to include both the deep and shallow rights but at a lower net-revenue interest than it held under the Arrington Lease. In exchange, Headington offered to convey the deep rights in another tract of land to Petro Canyon.

While the acreage-swap negotiations were ongoing, Petro Canyon's affiliate—Double Eagle—became the operator of record for the Arrington Wells, as reported in public filings on September 5. A week later, Headington's counsel informed Headington's vice president in a voicemail message that Finley had "assigned [its] interest in the lease [and] the wellbore to . . . Petro Canyon or Double Eagle." A few days

4

after that, Petro Canyon proposed that, as part of the acreage-swap agreement, the parties would execute mutual releases pertaining only to the Loving County Tract.

Further negotiations and some tinkering of the release language culminated in the execution of an acreage-swap agreement on October 3, 2017, that memorialized Petro Canyon's agreement to convey the WIRC Lease to Headington as to the entirety of the Loving County Tract. A mirror release provision in the agreement broadly provided that

> [Headington] waives, releases, acquits and discharges *Petro Canyon and its affiliates and their respective* officers, directors, shareholders, employees, agents, *predecessors* and representatives *for any liabilities, claims, demands, causes of action or obligations*, of whatever kind or character, including, without limitation, breach of contract, negligence, strict liability, indemnity or contribution that [Headington] has or may have in the future, whether asserted or unasserted, known or unknown, fixed or contingent, *related in any way to the Loving County Tract*; provided, however, that the foregoing release shall not apply to any obligations arising under this agreement.[2]

The well-plugging and restoration liability Petro Canyon had previously assumed was, however, expressly carved out:

> Notwithstanding the above, the above release does not cover, and Petro Canyon agrees to accept, plugging and restoration liability existing prior to the date hereof on the Loving County Tract with respect to, and only with respect to, the [Arrington Wells].

Finley was not named in the release or elsewhere in the acreage-swap agreement. Nor were Headington's putative claims against Finley

---

[2] Emphases added.

mentioned.[3] The agreement referenced the Arrington Wells for the limited purpose of *excluding* restoration and well-plugging liability from the scope of the releases but did not refer to the Arrington Lease at all.

Less than six months after executing the acreage-swap agreement, Headington sued Finley seeking $54.4 million in damages for breach of contract and, in the alternative, negligence and negligent misrepresentation.[4] Headington asserted that Finley's noncompliance with contractual notice and disclosure obligations caused Headington to lose its mineral interests when the Arrington Lease terminated due to nonproduction from the Arrington Wells. Finley's answer asserted, among other things, the affirmative defenses of release, waiver, and third-party beneficiary to the acreage-swap agreement.[5]

As Finley's potential indemnitor under the Quitclaim Assignment, Petro Canyon intervened, seeking a declaration that the release bars Headington's claims against Finley as a "predecessor" to Petro Canyon or Double Eagle. Like Finley, Petro Canyon alleged that, with knowledge of Finley's assignment to Petro Canyon, Headington

---

[3] The acreage-swap agreement identified a pending legal dispute over ownership of the Loving County Tract by style, cause number, and judicial tribunal, but that litigation involved entirely different entities. *See* 623 S.W.3d 480, 486 (Tex. App.—Dallas 2021) (quoting the provisions of the acreage-swap agreement identifying pending litigation between W.I.R.C., LLC and Dallas Petroleum Group LLC).

[4] Damages alleged include (1) the expenditures required to secure the acreage swap; (2) the difference between the net revenue under the original lease (87.5%) and the new lease (75%); (3) exemplary damages; and (4) attorney's fees for breach of contract.

[5] *See* TEX. R. CIV. P. 94 (listing and defining affirmative defenses).

6

had released Petro Canyon and its "predecessors" from all claims "related in any way to the Loving County Tract."

In cross-motions for summary judgment on the affirmative defenses, the parties framed the controlling question as whether Headington's broad release of "Petro Canyon and its affiliates and their respective . . . predecessors" for all claims and causes of action that are "related in any way to the Loving County Tract" extinguished Headington's claims against Finley.

For the most part, the parties locked horns over the meaning of "predecessors." Finley's and Petro Canyon's separately filed summary-judgment motions tracked one another in asserting that "predecessor" simply means "one who precedes another in office or position," making the release applicable to Finley as a (1) predecessor-in-title to Petro Canyon under the Quitclaim Assignment, (2) predecessor-in-interest to Petro Canyon based on its assumption of Finley's liabilities and obligations under the Arrington Lease, and (3) predecessor well operator to Petro Canyon's affiliate, Double Eagle. Headington's summary-judgment motion argued that, as used in the release, "predecessors" unambiguously refers only to the corporate predecessors of Petro Canyon and its affiliates. Headington also disputed whether Finley was actually a predecessor to Petro Canyon in any of the ways it claimed.

After much back and forth between the parties, the trial court sided with Finley and Petro Canyon, ruling that the term "predecessors" in the release unambiguously "includes an entity that is a predecessor in title to the subject property interest," like Finley. Following interlocutory orders denying Headington's summary-judgment motion

7

and granting Finley's and Petro Canyon's motions, the court rendered a final take-nothing judgment.

A divided court of appeals reversed, rendered judgment that the release did not bar Headington's claims against Finley, and remanded for further proceedings.[6] The court held that (1) categorical releases must be narrowly construed; (2) the meaning of "predecessors" is contextually constrained by words unambiguously "describ[ing] predecessors within the corporate composition or structure of Petro Canyon and its affiliates"; (3) neither parol evidence nor surrounding circumstances could broaden the release's narrower use of the term; and (4) Finley was not a released party because it was neither specifically identified in the release nor a corporate predecessor of Petro Canyon or Double Eagle.[7] Viewing releases as effecting a "forfeiture" of claims, the court declined to construe the contract language "in a manner that favors forfeiture" absent language compelling the conclusion that it "can be construed in no other way."[8] Finley's waiver and third-party-beneficiary defenses, which turned on its proffered construction of the release, failed for essentially the same reasons.[9]

The dissent would have held Finley was released as Petro Canyon's "predecessor" because "Finley's identity and its connection

---

[6] 623 S.W.3d at 484.

[7] *Id.* at 490-96.

[8] *Id.* at 490, 494.

[9] *Id.* at 496-98. Petro Canyon also moved for summary judgment on its declaratory-judgment counterclaim, but the court of appeals held the claim was improper because it was identical to and duplicative of the affirmative defenses. *Id.* at 499. Petro Canyon has not appealed the adverse ruling.

with the activity for which Petro Canyon signed this Release—the transfer of mineral interests in the Loving County Tract—are not in doubt."[10] In determining that the ordinary meaning of "predecessors" was not limited to corporate-level entities and did not exclude predecessors in title,[11] the dissent considered not only "the intentions of the parties as expressed in the agreement" but also "the context of the circumstances surrounding [the acreage-swap agreement], including the events leading to its formation, the relationships of the parties, [and] each party's motivations for entering the agreement."[12]

On petition for review, the primary issue is the proper construction of the term "predecessors."

## II

The summary-judgment motions involve legally distinct affirmative defenses, but for each, the dispositive question is the same: whether "predecessors," as used in the acreage-swap agreement, includes Finley such that Headington's claims against Finley arising from the Arrington Lease's alleged termination were released or waived when Headington contracted with Petro Canyon to acquire the WIRC Lease. Because this issue presents a question of law raised on cross-motions for summary judgment, we must determine all questions under a de novo standard of review and render the judgment the trial court should have rendered.[13]

---

[10] *Id.* at 507 (Partida-Kipness, J., dissenting).

[11] *Id.* at 505-06.

[12] *Id.* at 500.

[13] *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

9

# A

At issue here is an agreement to surrender legal rights and obligations as part of a bargained-for exchange.[14] Although a release "operates to extinguish [a] claim or cause of action" and is "an absolute bar to any right of action on the released matter,"[15] the court of appeals mischaracterized it as effecting a "forfeiture." A release involves a voluntary relinquishment, while a forfeiture connotes a consequence imposed as a penalty.[16]

Even so, to avoid unintentionally losing valuable rights against unnamed—and perhaps unknown—wrongdoers, we have long said that a release will discharge only those persons "named" or identified "with such descriptive particularity" that their identity or connection to the released claims "is not in doubt."[17] "[The] requirement of specific

---

[14] *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993).

[15] *Id.*

[16] *See Forfeiture,* BLACK'S, *supra* note 1, at 792 (defining "forfeiture" as a "divestiture of property without compensation[;] loss of a right, privilege, or property because of a crime, breach of obligation, or neglect of duty[; or] destruction or deprivation of some estate or right because of the failure to perform some contractual obligation or condition"); *see also, e.g.*, *NCAA v. Jones*, 1 S.W.3d 83, 85 (Tex. 1999) (characterizing "forfeiture of individual records, performances and awards[;] forfeiture of team victories, records, performances and awards[;] and forfeiture of receipts from any competition in which the ineligible athlete participated" as "penalties").

[17] *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (Tex. 1984); *see McMillen v. Klingensmith*, 467 S.W.2d 193, 196 (Tex. 1971) (adopting the "named" or "specifically identified" standard the Court subsequently applied in *Duncan*). Although first articulated in cases involving multiple tortfeasors, we have rejected the notion that the descriptive-particularity requirement is limited to that context. *Angus Chem. Co. v. IMC Fertilizer, Inc.*, 939 S.W.2d

identification is not met unless the reference in the release is so particular that 'a stranger could readily identify the released party.'"[18]

Finley is not named in the release or even the acreage-swap agreement, so whether the release encompasses Finley comes down to the meaning of a single word. A release is a contract, so we construe it as such.[19] When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the intentions the parties have objectively manifested in the written instrument.[20] Because objective intent controls, our focus is on the contract's language.[21] Here, the word "predecessors" carries its plain, ordinary, and generally accepted meaning because the acreage-swap agreement does not define it or use it in a technical or specialized way.[22]

That does not mean, however, that the word must carry every meaning to which it is naturally susceptible. Rather, "a primary

---

138, 139 (Tex. 1997) (stating that the rule from *McMillen* "is not limited to [the multiple tortfeasor] context").

[18] *Duncan*, 665 S.W.2d at 419-20 (clarifying that the requirement of specific identification adopted in *McMillen* applies to those persons identified "with such descriptive particularity" that "'a stranger could readily identify the released party'").

[19] *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990).

[20] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

[21] *Id.* at 763-64.

[22] *Id.*; *see DeWitt Cnty. Elec. Coop. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999) (contract language carries its plain and grammatical meaning unless doing so would defeat the parties' intent).

determinant of meaning" is context.[23]  For that reason, language that might evoke multiple meanings if read in isolation will often be made more precise by its contextual use.[24]  On the other side of the coin, even if context does not narrow meaning, mere breadth of a disputed term does not perforce equate to ambiguity.[25]  An unmodified term that "'invokes many different definitions'" could, of course, be so broad "'in the abstract'" that it is vague and ambiguous,[26] but a contract is ambiguous only if it is subject to more than one reasonable interpretation after the pertinent rules of construction have been applied.[27]  If contract language can be given a certain or definite legal meaning when considered as a whole, and in light of the objective

---

[23] *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation Of Legal Texts* 167 (2012)).

[24] *URI*, 543 S.W.3d at 764 (recognizing that words are "imperfect" implements of communication that often "cannot be assigned a rigid meaning, inherent in themselves"; instead, "their meaning turns upon use, adaptation and context as they are employed to fit various and varying situations" (quoting *State of Cal. Dep't of Mental Hygiene v. Bank of Sw. Nat'l Ass'n*, 354 S.W.2d 576, 579 (Tex. 1962))).

[25] *Cf. Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (observing that a statute's application in situations not expressly anticipated demonstrates breadth, not ambiguity).

[26] *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 327 (Tex. 2017) (quoting the court of appeals' opinion approvingly).

[27] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

12

circumstances surrounding its execution, the contract is not ambiguous and must be construed as a matter of law.[28]

## B

Finley and Petro Canyon take a broad view of the release's language and contend that, as a matter of law, we must as well because neither the contract language nor the circumstances surrounding the release's execution support limiting that term to "corporate" predecessors. In their view, the release includes all forms of predecessors given (1) the term's ordinary meaning as "one who precedes"; (2) the absence of any modifier; (3) the release's otherwise broad and encompassing language; and (4) surrounding circumstances that confirm Headington's actual or constructive notice of Finley's relationship to Petro Canyon, Double Eagle, and the Loving County Tract. Citing the nature of the underlying transaction, they further contend "predecessors" naturally refers to predecessors in title and must do so here because the acreage-swap transaction involved an exchange of title with a named corporate entity (Petro Canyon) that (like its affiliate, Double Eagle) has no corporate predecessor.

Headington takes a narrower view of the disputed term and says the court of appeals' analysis was correct because (1) the meaning of "predecessors" is informed by its antonym; (2) "successors" of a business entity classically refers to legal succession, such as by merger or consolidation; and (3) by including "predecessors" in a categorical list of

---

[28] *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see Mem'l Med. Ctr. v. Keszler*, 943 S.W.2d 433, 434 (Tex. 1997) ("[T]he interpretation of [an unambiguous] release is to be decided by the court as a question of law.").

entity-related groups, that is exactly how the release uses the term. Headington further argues that, contextually, "predecessors" cannot refer to precedent well operators because the release expressly excludes liability for plugging the Arrington Wells. Nor could the term refer to the Arrington Lease itself because the acreage-swap agreement transfers rights only under the WIRC Lease without ever mentioning the Arrington Lease. Finally, while collateral indemnification obligations may have motivated Petro Canyon to secure a release for Finley, Headington says a party's subjective intentions cannot alter the meaning of clear and unambiguous contract language. What is more compelling from Headington's perspective is that, as an objective matter, the acreage-swap agreement was executed by sophisticated entities with legal representation, and if it had been their true intention to release Finley, the agreement could have explicitly said so.

On appeal, both sides contend that the acreage-swap agreement is unambiguous as to the scope of the released parties, but if it is not, they take divergent views about how to resolve any ambiguity. Headington argues that ambiguity would be fatal to Finley and Petro Canyon based on the "descriptive particularity" requirement, but Finley and Petro Canyon argue that, like any other contract, ambiguity must be resolved by a fact finder who may rely on extrinsic evidence. Because we conclude that the release is not ambiguous as to the meaning of "predecessors," we do not address the matter.

## C

In broad-form fashion, the release describes *what* is being released as any and all claims and causes of action, past or present, known or unknown, that are "related in any way to the Loving County

14

Tract."[29] Breach-of-contract and negligence claims, like those asserted in this lawsuit, are expressly included among them, and Headington's claims are unquestionably related to the Loving County Tract.

The release identifies *who* is being discharged as "Petro Canyon and its affiliates and their respective officers, directors, shareholders, employees, agents, predecessors and representatives." By this categorical language, Petro Canyon and Headington indisputably extended the release's benefits to classes of unnamed individuals and entities.[30] While the classes are not so inherently broad or unlimited as to fail for want of descriptive particularity,[31] the identity of the constituent class members—which will necessarily be established with extrinsic evidence—turns on the meaning of the categorical terms. The acreage-swap agreement does not define any of them.

Commonly understood, "predecessor" could fairly embrace all the capacities Finley claims to hold. Case law does not provide a general definition of the term, but it broadly means someone who precedes

---

[29] *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000) (holding that broad-form releases covering "all demands, claims or causes of action of any kind whatsoever" met the requirement that the release must "mention" the claim to effectively release it).

[30] *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984) (holding that "general, categorical release clauses" are not impermissible but must be "narrowly construe[d]").

[31] *Cf. id.* at 419 (release of "any other corporations or persons whomsoever responsible" lacked the degree of specificity required to release a defendant who fell within its scope but was not otherwise named in the release).

15

another.[32] For that reason, it is not uncommon for the term to be used casually as a shorthand for "predecessor in title" or "predecessor in interest."[33]

Often, "predecessor" is defined referentially to its antonym, "successor,"[34] which, comparatively speaking, has been a more frequent focus of the jurisprudence. "The term 'successor' in common parlance has many meanings."[35] In its broadest sense, "successor" means "anyone who follows."[36] But as is usually the case, the intended breadth

---

[32] *Predecessor*, BLACK'S, *supra* note 1, at 1426 ("Someone who precedes another, esp. in an office or position . . . An ancestor."); *accord*, *e.g.*, NEW OXFORD AMERICAN DICTIONARY at 1376 (3d ed. 2010) ("[A] person who held a job or office before the current holder . . .; a thing that has been followed or replaced by another.").

[33] *See generally Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 328-29 (Tex. 2020) (using "predecessor" as shorthand for "predecessor in title"); *Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 748 (Tex. 2009) (using "predecessor" as shorthand for "predecessor in interest"); *Othen v. Rosier*, 226 S.W.2d 622, 625-28 (Tex. 1950) (generally referring to the petitioner's "predecessors in title" as his "predecessors").

[34] *See, e.g.*, *Predecessor*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY at 977 (11th ed. 2020) ("[O]ne that precedes; *esp*: a person who has previously occupied a position or office to which another has succeeded."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1785 (2002) ("[A] person who has previously occupied a position or office to which another has succeeded . . .; something that has been followed or displaced by another.").

[35] *Int'l Ass'n of Machinists, Lodge No. 6 v. Falstaff Brewing Corp.*, 328 S.W.2d 778, 781 (Tex. App.—Houston 1959, no writ).

[36] *Id.*; *see Successor*, MERRIAM-WEBSTER'S, *supra* note 34, at 1247 ("[O]ne that follows; *esp*: one who succeeds to a throne, title, estate, or office."); *accord* BLACK'S, *supra* note 1, at 1732 ("1. Someone who succeeds to the office, rights, responsibilities, or place of another; one who replaces or follows a predecessor. 2. A corporation that, through amalgamation, consolidation, or

16

is context-dependent. "In the classic sense of the term, the 'successor' of a business entity is not an assignee, but rather refers to rights and obligations transferred by merger, consolidation, or other legal succession."[37] The term has also been defined as applying to "one who takes the place that another has left, and sustains the like part or character"[38]—that is, one who has stepped into the shoes of another and assumed the same role or function even without the existence of a formal or legal relationship with the predecessor.[39] Given the range of potential

---

other assumption of interests, is vested with the rights and duties of an earlier corporation.").

Black's Law Dictionary does not include any sub-entries or sub-definitions for "predecessor in title," "predecessor in interest," or "corporate predecessor," but it does have numerous separate entries for specific kinds of "successors." The entry for "successor in interest" defines the term as: "Someone who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance." BLACK'S, *supra* note 1, at 1732.

[37] *Broadway Nat'l Bank v. Yates Energy Corp.*, 631 S.W.3d 16, 25 n.5 (Tex. 2021) (citing *Enchanted Ests. Cmty. Ass'n v. Timberlake Improvement Dist.*, 832 S.W.2d 800, 802 (Tex. App.—Houston [1st Dist.] 1992, no writ)); *see Int'l Ass'n of Machinists*, 328 S.W.2d at 781 (holding that an asset purchaser was not bound to the seller's contract with a labor union; although the common understanding of "successor" "means anyone who follows," it means something different when applied to corporations); *see also Farm & Home Sav. Ass'n v. Strauss*, 671 S.W.2d 682, 685 (Tex. App.—Dallas 1984, no writ) (in the context of the particular transaction, "successors" was a "term of art" that did "not encompass the third party purchasers of a parcel of land").

[38] *Enchanted Ests.*, 832 S.W.2d at 802.

[39] *See Augusta Ct. Co-Owners' Ass'n v. Levin, Roth & Kasner*, 971 S.W.2d 119, 126 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (a "successor" "contemplates an assumption of both rights and obligations or 'stepping into the shoes' of another"); *Enchanted Ests.*, 832 S.W.2d at 802-03 (plaintiff was a "legal successor" and third-party beneficiary of contract based on evidence that the plaintiff had assumed rights and obligations and was

applications, the precise meaning in a particular contract must largely depend on the use and context in which the term is employed.[40]

When reading a contract, or anything really, the intended meaning of a word is informed by its grammatical use.[41] Finley and Petro Canyon would have us read "predecessors" as referring to the "Loving County Tract" and, therefore, composed of predecessors in title, interests, or well operations with respect to *that property*. But "predecessors" grammatically refers back to the *entities* released—Petro Canyon and its affiliates. The "Loving County Tract" refers back to, and limits, the *claims* released but it does not define the *releasees*. The syntactic use of "predecessors" thus connotes a prior connection *to the corporate entities themselves*, not the land.

This understanding of the disputed term is also congruent with the release's inclusion of it in a list of entity-related words. "[T]he basic

authorized to step into the shoes of a nonaffiliated entity who had contracted with the defendant); *see also Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893-94 (Tex. 2017) (rejecting the appeals court's limitation of "succeeds to the interest" as referring only to "a 'successor' in the corporate-transaction sense," and holding an insurance company succeeded to a homeowners association's interest under an assignment).

[40] *Thompson v. N. Tex. Nat'l Bank*, 37 S.W.2d 735, 739 (Tex. Comm'n App. 1931, holding approved) ("The exact meaning [of successor] as applied to a contract wherein the word is used must depend largely on the kind and character of the contract, its purposes and circumstances, and the context."); *see Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019) (isolating words in a contract distorts meaning); *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018) (observing that "word[s] can carry subtle—and significant—differences in meaning when applied to different situations").

[41] *DeWitt Cnty. Elec. Coop. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999) (contract language bears its plain grammatical meaning unless doing so would defeat the parties' intent).

18

principle that words are given meaning by their context" includes the more specific concept that, when words are associated in a context that suggests they share a common quality, "they should be assigned a permissible meaning that makes them similar" but consistent with their ordinary meaning.[42]  Finley and Petro Canyon concede, as they must, that officers, directors, shareholders, and employees share the trait of being related, in one way or another, within the corporate structure of the released corporate entities.  But they assert that "agents" and "representatives" do not similarly share that quality with the other words in the list, so it would be improper to circumscribe the breadth of those words or "predecessors" based on some purported commonality. On that, we cannot agree.

As undefined terms, "agent" and "representative" carry their ordinary meaning.  An agent is one who "consent[s] to act on the principal's behalf and subject to the principal's control" when the principal has "authoriz[ed] . . . the agent to act on his behalf."[43] Likewise, a "representative" is "one that represents another as agent, deputy, substitute, or delegate usu[ally] being invested with the

---

[42] Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 49, 195-98 (2012) (discussing contextual canons including the associated-words canon, also known as *noscitur a sociis*, meaning "it is known by its associates"); *see Flagship Credit Corp. v. Indian Harbor Ins. Co.*, 481 F. App'x 907, 911-12 (5th Cir. 2012) (describing the associated-words canon as "a traditional means of limiting statutory or contract words from being given every conceivable meaning" that has been employed by Texas courts when considering whether a contract is ambiguous).

[43] *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 691 (Tex. 2017); *Agent*, BLACK'S, *supra* note 1, at 79 ("Someone who is authorized to act for or in place of another; a representative.").

authority of the principal."[44]  All of the categories in the list share the quality of being authorized to act, in some way or another, on behalf of the entities; unrelated predecessors in title, interest, or well operation do not.  Finley has a precedent relationship to the Loving County Tract, but it does not have a precedent business connection with or relationship to Petro Canyon or its affiliate, Double Eagle, and one simply could not reasonably discern from anything in the acreage-swap agreement that Headington intended to release its claims against Finley.[45]

In these proceedings, the parties have made much ado about the "circumstances surrounding" the acreage-swap transaction and how they bear on the meaning of the release's language.  To be fair, we have said that, even when an agreement is unambiguous, context that informs the meaning of contract language includes "objectively determinable facts and circumstances that contextualize the parties' transaction."[46]  But that's not an invitation to backdoor parol evidence of subjective intent, like the parties' motivations for entering the agreement.  Rather, "[i]n the same way that dictionary definitions, other

[44] *Representative*, MERRIAM-WEBSTER'S, *supra* note 34, at 1057; *accord* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra* note 34, at 1926 ("[S]tanding for or in the place of another: acting for another or others: constituting the agent for another esp. through delegated authority."); BLACK'S, *supra* note 1, at 1557 ("Someone who stands for or acts on behalf of another.").

[45] *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011) (a contract is ambiguous if it is reasonably susceptible to more than one reasonable interpretation after application of pertinent rules of construction, but it is not ambiguous "[if] it can be given a certain or definite legal meaning or interpretation").

[46] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 757-58 (Tex. 2018).

statutes, and court decisions may inform the common, ordinary meaning of a statute's ambiguous language, circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language. But courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say."[47]

Commercial setting, trade custom, and trade usage are objective surrounding circumstances that may shed light on the meaning of contract language.[48] In this case, no trade custom or usage is asserted to apply here, but we would, for example, consider as informative the subject matter of the acreage-swap agreement being a land transaction. Likewise, courts may consider the sophistication of the parties and the participation of legal counsel, which carry an expectation that the parties were aware of what to bargain for and understood the terms of their written agreement.[49] In that regard, there is a significant omission

---

[47] *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017).

[48] *URI*, 543 S.W.3d at 768.

[49] *See James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 403 (Tex. 2022) ("Texas courts regularly enforce unambiguous contract language agreed to by sophisticated parties in arms-length transactions."); *Transcor Astra Grp. S.A. v. Petrobas Am., Inc.*, 650 S.W.3d 462, 473-74 (Tex. 2022) ("Whether a reliance disclaimer is effective in any given case depends on the contract's language and the totality of the surrounding circumstances," including representation by counsel, sophistication of the parties, and knowledge of the industry (internal quotation marks omitted)); *Energy Transfer Partners, L.P. v. Enter. Prods. Partners, L.P.*, 593 S.W.3d 732, 738 (Tex. 2020) ("Texas courts regularly . . . reject legal claims that are artfully pleaded to skirt unambiguous contract language, especially when that language is the result of arm's-length negotiations between sophisticated business entities.").

in the agreement: Finley is not named in the agreement or the release despite the looming threat of litigation and Headington's proximal demand for information bearing on termination of the Arrington Lease. In comparison, the acreage-swap agreement mentions a pending legal dispute over ownership of the Loving County Tract with a notable degree of specificity.[50]

But even considering all this, use of surrounding circumstances is subject to a hard stop: such evidence cannot contradict, change, enlarge, or supplement the contract language and, instead, may only give the parties' chosen words "a meaning consistent with that to which they are reasonably susceptible," that is, to elucidate the meaning of the words the parties employed—and nothing else.[51] "As we have often stated in one way or another, '[u]nderstanding the context in which an agreement was made is essential in determining the parties' intent *as expressed in the agreement*, but it is the parties' *expressed intent* that the court must determine.'"[52] So while the surrounding circumstances may assist interpreting the release's language, they can neither change what the contract says nor create an ambiguity.[53] Because the acreage-swap agreement, construed as a whole, unambiguously narrows the scope of what has the potential to be a very broad term, evidence of the surrounding circumstances cannot enlarge its meaning.

---

[50] *See supra* note 3.

[51] *URI*, 543 S.W.3d at 765, 769.

[52] *Id.* at 765 (alteration in original) (quoting *Anglo–Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011)).

[53] *Id.*

Although we hold that "predecessors" bears the narrower meaning Headington ascribes to it, this conclusion does not derive from any rule requiring releases to be construed "narrowly" or from a want of "descriptive particularity." Instead, it follows from the plain meaning of the term as constrained by the linguistic and grammatical context in which it is used.

## D

Having concluded that Headington did not release its Loving County Tract claims against Finley, the affirmative defenses of third-party beneficiary and waiver also fail. Though status as a third-party beneficiary of a contract is not necessarily aligned with questions about the identity of the released parties,[54] in this case there is no daylight between Finley's third-party-beneficiary and release claims.

The waiver defense also hinges on the release's application to Headington's claims against Finley. Because the release does not encompass Finley, there is no express waiver, as the court of appeals held. Neither Finley nor Petro Canyon argued implied waiver in the lower courts. Now, they assert that because waiver is a question of intent, we must also examine whether Headington's conduct, viewed in light of the surrounding facts and circumstances, is "unequivocally inconsistent with claiming [a known] right."[55] Other than executing the

---

[54] *First Bank v. Brumitt*, 519 S.W.3d 95, 102-04 (Tex. 2017) (setting out standards for a nonparty to claim a contract's benefits).

[55] *See Teal Trading & Dev., LP v. Champee Springs Ranches Prop. Owners Ass'n*, 593 S.W.3d 324, 334-35 (Tex. 2020).

release in the acreage-swap agreement, neither Finley nor Petro Canyon identifies any conduct on Headington's part that is inconsistent with its pursuit of the contract and tort claims asserted in this lawsuit. Nor is any such conduct readily apparent from the surrounding facts and circumstances, as reflected in the record.[56] Accordingly, the waiver defense fares no better than the others.

## III

Because Finley is neither named as a released party nor included within a category of released persons and entities, Headington is entitled to summary judgment on the affirmative defenses of release, waiver, and third-party beneficiary. We therefore affirm the court of appeals' judgment and remand the case to the trial court for further proceedings.

John P. Devine
Justice

**OPINION DELIVERED:** May 12, 2023

---

[56] *See Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) ("[F]or implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances. There can be no waiver of a right if the person sought to be charged with waiver says or does nothing inconsistent with an intent to rely upon such right." (internal citation omitted)).